Keith M. Knowlton - SBN 011565
Keith M. Knowlton, L.L.C.
9920 S. Rural Road, Suite 108, PMB# 132
Tempe, Arizona 85284-4100
(480) 755-1777; FAX (480) 471-8956
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Douglas C. Gilford,<br><br>                    Plaintiff,<br><br>vs.<br><br>Town Of Quartzsite, a municipal corporation  in the State of Arizona; Albert "Al" Johnson, individually and in his former various capacities including Certified Building Official and Assistant Town Manager for the Town of Quartzsite and Rhonda Johnson, husband and wife; Martin Brannan individually and in his former various capacities including Town Attorney, Town Prosecutor, Town Parliamentarian for the Town of Quartzsite and Janet Brannan, husband and wife; Jeff Gilbert individually and in his capacity of Chief of Police for the Town of Quartzsite and Sondra Gilbert, husband and wife; Fabiola Garcia individually and in her capacity of Police Officer and Sergeant for the Quartzsite Police Department and Juan A. Garcia Jr., wife and husband; Xavier Frausto individually and in his capacity of Sergeant for the Quartzsite Police Department and Terry Frausto, husband and wife; Felipe Rodriguez individually and in his capacity of Police Officer for the Quartzsite Police Department and Jane Doe Rodriguez, husband and wife; Joseph Michael Winslow, individually and in | Cause No. 2:13-cv-00468-SRB<br><br><br>AMENDED COMPLAINT<br><br><br>42 U.S.C. § 1983<br><br><br>Demand Jury Trial |

his former capacity as Council member for the Town of Quartzsite and Jane Doe Winslow, husband and wife;  Alexandra Taft individually and in her former capacity of Town Manager for the Town of Quartzsite; Laura Bruno individually and in her various capacities of "Interim" Town Manager and Town Manager for the Town of Quartzsite and Joe Bruno, wife and husband; Barbara Cowell, individually and in her former capacity as Council member for the Town of Quartzsite and Everett Cowell, wife and husband; Norma Crooks, individually and in her capacity as Council member for the Town of Quartzsite and John Doe Crooks, wife and husband; Michael Jewitt, individually and in his capacity as Council member for the Town of Quartzsite and Marie Jewitt, husband and wife; Carol Kelley, individually and in her capacity as Council member for the Town of Quartzsite; Mark Orgeron, individually and in his capacity as Council member for the Town of Quartzsite and Cheryl Orgeron, husband and wife; Jose Lizarraga, individually and in his former capacities as Council member and Mayor for the Town of Quartzsite and Jane Doe Lizarraga, husband and wife; Jerry Lukkasson, individually and in his former capacity as Council member for the Town of Quartzsite and Michelle Lukkasson, husband and wife; John & Jane Does I-X,

Defendants.

Plaintiff, Douglas C. Gilford ("Mr. Gilford"), as and for his complaint against Defendants, alleges as follows:

## **INTRODUCTION**

1.      This is a federal and state action for monetary damages and injunctive relief against the defendants named herein, in their official and/or individual capacities. The

factual basis of this complaint is that Defendants conspired to have Mr. Gilford unconstitutionally seized, falsely arrested and prosecuted without probable cause, in retaliation for Mr. Gilford's investigation of, complaints regarding and on his blog public criticism of Defendants,  which are protected activities pursuant to Mr. Gilford's First Amendment to the United States Constitution's and Article II, Sections 6 of the Arizona Constitution's rights to Free Speech, Freedom of the Press, Right to Associate, Right to Assemble and Right to seek Redress of Grievances.

2.     In furtherance of the conspiracy, and in clear violation of Plaintiff's constitutional rights, Defendants had law enforcement from the Town of Quartzsite falsely arrest Mr. Gilford without probable cause, had Mr. Gilford's person seized and or imprisoned three times (booked and released, jailed) and prosecuted Plaintiff without probable cause .

3.     In the first prosecution, three misdemeanor counts were levied against Mr. Gilford. The second prosecution (filed by the Town of Quartzsite Prosecutor nine days after the first) contained ten misdemeanor counts.  Mr. Gilford complied with summons and order by the Quartzsite Magistrate Court to appear at the La Paz County Jail for booking and release, then for a subsequent hearing on both cases on August 29, 2011. Mr. Gilford was then falsely arrested without a warrant and incarcerated (instead of cite and release or summons by complaint) in the third case, which contained an additional three more misdemeanor charges and so Mrs. Gilford had to post Mr. Gilford's bond.

4.     This is also an action for relief of injunctive remedy to protect Mr. Gilford's right to exercise his constitutionally protected First Amendment rights.   Defendants' conspiracy is ongoing and Plaintiff is continually exposed to further violations of his constitutional rights. Defendants' action have caused and will continue to cause Plaintiff and other similarly situated individuals to suffer public humiliation, violation of constitutional rights and additional harms unless these actions are stopped.

5.     Defendants have conspired to publically humiliate, intimidate and criminally prosecute Mr. Gilford on trumped up charges because of his association with other

individuals and his seeking redress of grievances with the Town of Quartzite.  *"[T]he right of individual citizens to be secure from an open and public accusation of crime, and from the trouble, expense and anxiety of a public trial, before a probable cause is established"* is understood to be *"(sic) one of the securities to the innocent against hasty, malicious, and oppressive public prosecutions, and as one of the ancient immunities and privileges of English liberty." Jones v. Robbins, 74 Mass. 329, 344 (1857).*

## JURISDICTION AND VENUE

6.     This Court has jurisdiction pursuant to 28 U.S.C.§§ 1331, 1343 & 1367(a), and 42 U.S.C. §§ 1983 and 1988.  This action also contains state tort claims that "derive from a common nucleus of operative fact" and are so related to the federal claim that they formed a single removable case or controversy over which this Court has jurisdiction.

7.     Venue is proper in the District Court of Arizona pursuant to 28 U.S.C. § 1391(b).

## PARTIES

8.     Plaintiff, Mr. Gilford is, and was at all times relevant, a naturally born citizen of the United States and resident of Quartzsite, Arizona.  In 2011 Mr. Gilford was maliciously charged with the below criminal counts, by the Town of Quartzsite in three separate cases:

*Criminal Case #1 of 3* (CR20110**093**)
*Criminal Case #2 of 3* (CR20110**097**)
*Criminal Case #3 of 3*  (CR20110**103**).

CRIMINAL COUNTS BROUGHT AGAINST MR.GILFORD TOWN OF QUARTSITE

| CASE: | COUNT: | | DISMISSAL /OR/ NOT GUILTY AT TRIAL |
|-------|--------|------------|-------------------------------------|
| 093 | 1 | Harassment | 8-10-11 Charged /March 8 2012 DISMISSAL |
| 093 | 2 | Harassment | 8-10-11 Charged/ March 8 2012 DISMISSAL |
| 093 | 3 | Harassment | 8-10-11 Charged /March 8 2012 DISMISSAL |
| 097 | 1 | Harassment | 8-19-11 Charged /July 3 2012 NOT GUILTY |
| 097 | 2 | Harassment | 8-19-11 Charged /July 3 2012 NOT GUILTY |

| 097 | 3 | Trespassing | 8-19-11 Charged /June 25 2012 DISMISSAL |
| 097 | 4 | Disorderly Conduct | 8-19-11 Charged/ July 3 2012 NOT GUILTY |
| 097 | 5 | False Reporting | 8-19-11 Charged /July 3 2012 NOT GUILTY |
| 097 | 6 | False Reporting | 8-19-11 Charged /July 3 2012 NOT GUILTY |
| 097 | 7 | False Reporting | 8-19-11 Charged /July 3 2012 NOT GUILTY |
| 097 | 8 | False Reporting | 8-19-11 Charged/ July 3 2012 NOT GUILTY |
| 097 | 9 | False Reporting | 8-19-11 Charged/ July 3 2012 NOT GUILTY |
| 097 | 10 | False Reporting | 8-19-11 Charged /July 3 2012 NOT GUILTY |
| 103 | 1 | Harassment | 9-1-11 ARRESTED July 3 2012 NOT GUILTY |
| 103 | 2 | Trespass | 9-1-11 ARRESTED June 25 2012 DISMISSAL |
| 103 | 3 | Disorderly Conduct | 9-1-11 ARRESTED July 3 2012 NOT GUILTY |

9.      Defendant Town of Quartzsite ("Town") is, at all times relevant, a municipal corporation in La Paz County, Arizona. At all times relevant the primary defendants named in the caption above, were employees, and/or or directors, and/or agents of the Town.

10.     Defendants Jeff Gilbert ("Chief Gilbert") and Sondra Gilbert are, at all times relevant, husband and wife residing in La Paz County, Arizona and or Mohave County, Arizona. At all times relevant, Defendant Jeff Gilbert held the position of Chief of Police for the Town and individually, and in his official capacity, caused events to occur in the Town out of which this Complaint arose.

11.     All actions taken by Defendant Jeff Gilbert were on behalf of the marital community.

12.     Defendants Albert "Al" Johnson ("Mr. Johnson") and Rhonda Johnson were, at all times relevant, husband and wife residing in La Paz County, Arizona and or  Riverside County, California.

13.    At all times relevant, Defendant Mr. Johnson held various positions including Certified Building Official and or Assistant Town Manager for the Town and individually, and in his official capacity, caused events to occur in the Town out of which this Complaint arose.

14.    All actions taken by Defendant Mr. Johnson were on behalf of the marital community.

15.    Defendants Martin Brannan ("Mr. Brannan") and Janet Brannan were, at all times relevant, husband and wife residing in La Paz County, Arizona.

16.    At all times relevant, Defendant Martin Brannan held the position Town Attorney and or Town Prosecutor and or Town Parliamentarian for the Town and individually, and in his official capacity, caused events to occur in the Town out of which this Complaint arose.  Mr. Brannan is not entitled to absolute or qualified immunity because his wrongful acts occurred outside of his role as a prosecutor and involved his role in initially planning and investigating potential criminal actions against Plaintiff before they began.

17.    All actions taken by Defendant Martin Brannan were on behalf of the marital community.

18.    Defendants Joseph Michael Winslow ("Mr. Winslow") and Jane Doe Winslow were, at all times relevant, husband and wife residing in La Paz County, Arizona.

19.    At all times relevant, Defendant Mr. Winslow held the position of Council member for the Town and individually, and in his official capacity, caused events to occur in the Town out of which this Complaint arose.

20.    All actions taken by Defendant Mr. Winslow were on behalf of the marital community.

21.    Defendants Alexandra Taft ("Ms. Taft") was a single woman, at all times relevant, residing in La Paz County, Arizona.

22.     At all times relevant, Defendant Ms. Taft held the position of Town Manager for the Town and individually, and in her official capacity, caused events to occur in the Town out of which this Complaint arose.

23.     Defendants Xavier Frausto ("Sgt. Frausto") and Terry Frausto were, at all times relevant, husband and wife residing in La Paz County, Arizona.

24.     At all times relevant, Defendant Sgt. Frausto held the position of Sergeant for the Town and individually, and in his official capacity, caused events to occur in the Town out of which this Complaint arose.

25.     All actions taken by Defendant Sgt. Frausto were on behalf of the marital community.

26.     Defendants Felipe Rodriguez ("Ofcr. Rodriguez") and Jane Doe Rodriguez were, at all times relevant, husband and wife residing in La Paz County, Arizona.

27.     At all times relevant, Defendant Ofcr. Rodriguez held the position of Police Officer for the Town and individually, and in his official capacity, caused events to occur in the Town out of which this Complaint arose.

28.     All actions taken by Defendant Ofcr. Rodriguez were on behalf of the marital community.

29.     Defendants Fabiola Garcia ("Sgt. Garcia") and Juan A. Garcia Jr. were, at all times relevant, wife and husband residing in La Paz County and or Maricopa County, Arizona.

30.     At all times relevant, Defendant Sgt. Garcia held the position of Police Officer and or Sergeant for the Town and individually, and in her official capacity, and acted under color of state law in causing events to occur in the Town out of which this Complaint arose.

31.     All actions taken by Defendant Sgt. Garcia were on behalf of the marital community.

32.     Defendants Laura Bruno ("Ms. Bruno") and Joe Bruno were, at all times relevant, wife and husband residing in La Paz County, Arizona and or the state of Nevada.

33.    At all times relevant, Defendant Ms. Bruno held the position of "Interim" Town Manager and or Town Manager for the Town and individually, and in her official capacity, caused events to occur in the Town out of which this Complaint arose.

34.    All actions taken by Defendant Ms. Bruno were on behalf of the marital community.

35.    Defendants Barbara Cowell ("Ms. Cowell") and Everett Cowell were, at all times relevant, wife and husband residing in La Paz County, Arizona.

36.    At all times relevant, Defendant Ms. Cowell held the position of elective official Council member and or Vice Mayor for the Town and individually, and in her official capacity, caused events to occur in the Town out of which this Complaint arose.

37.    All actions taken by Defendant Ms. Cowell were on behalf of the marital community.

38.    Defendants Norma Crooks ("Ms. Crooks") and John Doe Crooks were, at all times relevant, wife and husband residing in La Paz county, Arizona.

39.    At all times relevant, Defendant Ms. Crooks held the position of elective official Council member for the Town and individually, and in her official capacity, caused events to occur in the Town out of which this Complaint arose.

40.    All actions taken by Defendant Ms. Crooks were on behalf of the marital community.

41.    Defendants Michael Jewitt ("Mr. Jewitt") and Marie Jewitt were, at all times relevant, husband and wife residing in La Paz County, Arizona.

42.    At all times relevant, Defendant Mr. Jewitt held the position of elective official Council member and or Vice Mayor for the Town and individually, and in his official capacity, caused events to occur in the Town out of which this Complaint arose.

43.    All actions taken by Defendant Mr. Jewitt were on behalf of the marital community.

44.     Defendant Carol Kelley ("Ms. Kelley") was, at all times relevant, a widowed woman residing in La Paz County, Arizona.

45.     At all times relevant, Defendant Ms. Kelley held the position of elective official Council member for the Town and individually, and in her official capacity, caused events to occur in the Town out of which this Complaint arose.

46.     Defendants Mark Orgeron ("Mr. Orgeron") and  Cheryl Orgeron were, at all times relevant, husband and wife residing in Yuma County and or La Paz County, Arizona.

47.     At all times relevant, Defendant Mr. Orgeron held the position of elective official Council member for the Town and individually, and in his official capacity, caused events to occur in the Town out of which this Complaint arose.

48.     All actions taken by Defendant Mr. Orgeron were on behalf of the marital community.

49.     Defendants Jose Lizarraga ("Mr. Lizarraga") and Jane Doe Lizarraga were, at all times relevant, husband and wife residing in La Paz County, Arizona.

50.     At all times relevant, Defendant Mr. Lizarraga held the position of elective official Council member and or Mayor for the Town and individually, and in his official capacity, caused events to occur in the Town out of which this Complaint arose.

51.     All actions taken by Defendant Mr. Lizarraga were on behalf of the marital community.

52.     Defendants Jerry Lukkasson ("Mr. Lukkasson") and Michelle Lukkasson were, at all times relevant, husband and wife residing in Yavapai County and or La Paz County, Arizona.

53.     At all times relevant, Defendant Mr. Lukkasson held the position of elective official Council member for the Town and individually, and in his official capacity, caused events to occur in the Town out of which this Complaint arose.

54.     All actions taken by Defendant Mr. Lukkasson were on behalf of the marital community.

55.     Pursuant to A.R.S. §12-821.01, a Notice of Claim was timely served on each Defendant except Bruno, Cowell, Crooks, Jewitt, Kelley, Orgeron, and Lukkasson who are Defendants under the 42 U.S.C. § 1983 and injunctions claims.  As set forth herein, Plaintiff has fully complied with the requirements of A.R.S. §12-821.01 to bring this action against a municipality and/or its employees and or its directors.

56.     Plaintiff requests a jury trial.

## **FACTUAL ALLEGATIONS**

57.     Town leadership and Town police sought retaliation upon Mr. Gilford, for exercising his constitutional rights by unlawfully charging Mr. Gilford with numerous crimes and publically criticizing him over an ongoing period of time.  The retaliation eventually took the form of 3 criminal cases which totaled 16 misdemeanor counts, all brought in a time period of less than 23 days in August and September 2011.

58.     Failing to see Mr. Gilford found guilty at trial of any of the sixteen charges, the day (July 3, 2012) he was acquitted of the falsely made charges that had not already been dismissed, Mr. Gilford was maliciously slapped, (only hours after his acquittals) with a Workplace Harassment Injunction so as to exclude him from Quartzsite Town Hall ("QTH") (except for the most limited of circumstances) with intent to suppress his First Amendment rights.

59.     To do any business with the Town, professionally or personally, Mr. Gilford was reduced by the restrictions of Court Order to direct contact with the Town only by mail, email or fax communications with Town staff.

60.     Over a two to three year period preceding Mr. Gilford's eventual, warrantless September 1, 2011 arrest and seizure (by the Town of Quartzsite), Mr. Gilford became concerned about incompetence, the appearance of corruption, and lack of transparency in the government of the Town of Quartzsite and decided to become proactive as a citizen with the Town and with other local citizens who had the same concerns.

61.     A result of his activities, while exercising his First Amendment rights or seeking to exercise his First Amendment rights, Mr. Gilford triggered the ire of the Town of Quartzsite, its officers and officials who conspired to retaliate against him and/or conspired to interfere with Mr. Gilford's constitutionally-protected activities in the community and at QTH, including those which impacted his licensed real estate activities (ability to earn a living) and ability to make inquiries to the Town regarding real estate transactions.

62.     Before and since his (September 1, 2011) arrest Mr. Gilford has suffered ongoing denial of his constitutionally protected activities or attempts to exercise such (all events which together have caused this action).

63.     Mr. Gilford participated, beginning in late 2008, in a loosely organized, non-partisan "*reform coalition*" of Quartzsite citizens who had begun meeting (in public places) in 2008 due to various concerns regarding the Town's administration and governance.  Mr. Gilford is one of several Quartzsite citizens (all prior members of the "Citizens Coalition" such as Michael Roth, Vito Austin, Sean Austin, Edward Foster, Patricia Workman, Jennifer Jones, Jack Jones, Richard Oldham, Dean Taylor, Chaunce Hamilton, Hal Davidson and Russell Sias) who have since beginning to assemble or associate as Citizens Coalition associates in 2008 eventually suffered arbitrary, malicious discrimination/harassment and/or malicious retaliatory false arrests and seizures (since 2009, without probable cause or legitimate government interest) by the Town of Quartzsite.

64.     Mr. Gilford, like Michael Roth, Vito Austin, Sean Austin, Edward Foster, Patricia Workman, Jennifer Jones, Jack Jones, Richard Oldham, Dean Taylor, Chaunce Hamilton, Hal Davidson, and Russell Sias, has experienced invidious discrimination/harassment and/or false accusations and/or false arrests (and/or Town interference with their legitimate business operations) all of which have been accomplished by and through numerous town officials, and/or town officers, and/or town employees working in

combination to retaliate against the forenamed citizens, because they were known to have associated and assembled together as citizens (under the moniker of the "Citizens Coalition"), and because they exercised their individual rights of freedom of press, freedom of speech, and freedom to protest online, in public, and/or in print.

65.     Although  Mr. Gilford had attended meetings of the "Citizens Coalition" beginning in 2008, seeking to bring an important issue and concern to the attention of the town's directors and the public-at-large, Mr. Gilford became more blatantly proactive in local town matters when he stepped into the 'limelight' (in April 2009) before the town council on behalf of the "Citizens Coalition" and described a series of arbitrary acts and omissions which Mr. Gilford and another "Citizens Coalition" associate (Jerry Wilcox) who also spoke on the topic, believed were occurring within the Planning & Zoning department of the Town.

66.     In October 2010, Mr. Gilford began his internet blog and his video/audio recording efforts of Town meetings and public forums which activities became more frequent and organized through mid-2011.

67.     Between 2010 to early 2012, events involving Defendants  Alexandra Taft, Michael Jewitt, Albert "Al" Johnson, Martin Brannan, Jeff Gilbert, Fabiola Garcia, Xavier  Frausto, Felipe Rodriguez, Joseph Michael Winslow, Barbara Cowell, Jose Lizarraga and Jerry Lukkasson, who were at the time employees, and/or directors, and/or officers and/or agents of the Defendant Town of Quartzsite, came to the attention of Attorney of La Paz County, Sam Vederman (now Superior Court Judge of La Paz County) who observed and knew of certain events taking place in Quartzsite; and as a result of such knowledge submitted a letter to FBI Agent Farley (dated January 3, 2012) in regards to the acts and omissions  of Alexandra Taft, Michael Jewitt, Albert "Al" Johnson, Martin Brannan, Jeff Gilbert, Fabiola Garcia, Xavier  Frausto, Felipe Rodriguez, Joseph Michael Winslow, Barbara Cowell, Jose Lizarraga, Jerry Lukkasson. The letter to the FBI described a totality of inappropriate intersecting events of Quartzsite

citizens, Quartzsite politics (Council members), Quartzsite law enforcement, and the La Paz County justice system.

68.    The January 3, 2012 letter to the FBI reads, in part as follows:

"At this time I am requesting the FBI conduct an investigation into the Town and the QPD. I request an investigation because I believe there have been facts and circumstances, during the course of my term as the La Paz County Attorney, which have led me to the belief that certain citizens within the Town of Quartzsite may have been, and may currently be, targeted for arrest and prosecution, simply because they are in political opposition to the Town, QPD, Chief of Police Jeff Gilbert or other Town officials."

* * *

"The former Town Prosecutor, Matt Newman, was fired after approximately twelve years as the Town prosecutor. Mr. Newman was fired during the time he would not succumb to pressure by Town officials, and Chief Gilbert, to prosecute certain people."

69.    On January 12, 2012, former Town Prosecutor Matt Newman, who the Council immediately replaced by appointing Martin Brannan, underscored Vederman's letter to FBI Agent Farley, when Mr. Newman filed a Refusal of Appointment to provide public defender services to criminal defendants in Quartzsite Magistrate Court Case No.CR20110155, stating as follows (excerpt):

"I respectfully refuse this appointment. Moreover, I wish to inform this court that I will be unavailable to accept appointments in Quartzsite Magistrate Court in the future, at any hourly rate. It is my belief that the current administration of the Town has created an inherent conflict of interest by appointing the Town Prosecutor as the Town Attorney and Town Parliamentarian. It is also my belief that the current administration is specifically targeting certain individuals for prosecution due to their political views. As it is impossible to know in each particular case if the defendant may be one of those individuals, I do not desire to represent appointed clients at this time"

70.    Chief Gilbert, at all times relevant, serves as the Chief of the Quartzsite Police Department, is directly responsible for the actions of his officers and for disciplining (or not) his subordinates. Chief Gilbert has been accused and investigated for a number of documented complaints by his police officers. Chief of Police Jeff Gilbert interacted with Mr. Gilford in a manner that harassed on the following additional dates:

1.      2011: March 15 Chief Gilbert responded to a call from Mr. Johnson where Mr. Gilford was at QTH and had violated **no** law.  June 28. Chief Gilbert ordered Mr. Gilford to stop video from his position (standing waiting in line to speak at a public meeting). July 8, in QTH Chief Gilbert and three officers responded to video camera complaint made by a town employee against Mr. Gilford.  July 10 Chief Gilbert supervises Quartzsite Town Council meeting security, bars Mr. Gilford from attending the meeting. July 15 Chief Gilbert and Sgt. Frausto stop Mr. Gilford's video recording of them in QTH public lobby area.  August 9 Chief Gilbert singled out Mr. Gilford to command him not to video record a volunteer Town committee member while the public was assembling on the patio in front of QTH concurrent to a public Town Council meeting

2.      2012: February 28, Chief Gilbert and Sgt. Frausto enforced camera restrictions preventing Mr. Gilford from recording video or audio from a public seat during a Council meeting.  There was no signage restricting such acts.  August 31 Chief Gilbert (standing in his residence driveway) drew a handgun during service of process (meant for Gilbert) then taking place by Mr. Jack Jones.  Jones at all times had remained on public right of way. Mr. Gilford accompanied process server and recorded video. "Get off of my property."

71.      Chief Gilbert participated in and supervised the arrest of political-target (prior Citizens Coalition associate of Mr. Gilford) Jennifer Jones on June 28, 2011, while she was invited to the podium by then Mayor Ed Foster during "call to the public."  Mayor Foster was chairing the Council meeting, then underway.  Mr. Gilford recorded the shocking arrest of Jones with a handheld camera, and then placed the video on his blog www.QTown.us and his Youtube.com channel; eventually the video registered over 229,000 views on YouTube.  The video also drew hundreds of comments (on YouTube) from viewers around the world.

72.     As the video disseminated across web-platforms, it was soon identified by Town officials as having caused concern among Town officials. Two expressed increasing malice against Mr. Gilford, exemplified by their sworn statements to the Arizona Attorney General made in August of 2011. Council member Barbara Cowell: "*letting* [ Mr. Gilford] *"in the building with only one police officer to keep the peace could have led to unnecessary violence."* Alex Taft: *"The only other people who approached the door were the same people who had spearheaded the disruption of prior meetings, the same people that sent the video of the June 28 meeting to the anti-government web sites and ... attempt to recall the Council, i.e., Doug Gilford and Ms. Jones".* *"The tools that Gilford and Jones, along with others ... were harassment, heckling, making false statements, following Council Members around with video and still cameras, and bullying."*

73.     Town Manager Taft and Council member Cowell admit in sworn statements that Mr. Gilford was knowingly, intentionally, and particularly excluded from the July 10, 2011 "emergency" Council meeting due to, a) his having placed the June 28th video on YouTube, and, b) his signing a recall petition(s) despite the fact Mr. Gilford stood at the outside door of QTH for at least 30 minutes awaiting entry to the meeting (the locked door was being monitored by Sgt. X. Frausto while Mr. Gilford observed Chief Gilbert at the podium addressing the council).

74.     On July 10, 2011 during the council meeting in QTH Mr. Brannan stated as follows. This was at approximately the same time that Mr. Gilford arrived at the door to QTH and was excluded from entering the meeting.

> "It's at this point where the council's actions are going to be, uh, subject to great scrutiny. Um, and so, the very first thing on the agenda is for the council to decide whether or not an emergency exists, and if a emergency does exist, whether it is of such severity that it would justify having a "No Notice" meeting" from which the public is excluded. so that's a question of fact, not a question of law, how severe the threat is, or how severe you perceive the threat to be, but as a matter of law,

unless you perceive this threat to be of such severity that it requires you to act immediately without public notice then I would urge you not to make a motion, and not to vote 'aye" if, uh, if a motion is made and seconded. So you need to tread very carefully at this point..."

75.     Weeks prior to the "Un-Open" Council meeting of July 10, 2011, in late May 2011, an overwhelming majority of the police department's sworn officers voted no-confidence in Chief Gilbert and filed and signed written complaint with the Arizona Peace Officer Standards and Training Board against Chief Gilbert, alleging, among other things, that they (the officers) were being used or expected to violate the civil rights of residents of Quartzsite.

76.     The La Paz County Attorney Vederman directly mentioned this in his January 3, 2012 letter to F.B.I Agent Farley, writing, "*One Police Officer, now a Sergeant with the QPD, had previously contacted this office concerned that if he carried out the order(s) of Chief Gilbert he may violate the civil rights of a citizen or citizens.*"

77.     A DPS criminal investigation of QPD chief Jeff Gilbert (DR 2011-027462) resulted in multiple audio recorded interviews of QPD officers in August of 2011.  Most of these officers were terminated later, but all were employed by the Town at the time of their respective DPS interviews.  These officers stated the following in their interviews:

78.     **2011 08 18 DPS Interview QPD Officer William Ponce:**
        DT = Detective  WP = William Ponce

        DT: did Chief Gilbert direct you to conduct traffic stops and arrest or cite anyone?
        WP: "he directed me to, yes to all the above, to make traffic stops, to arrest cite people.
        I wouldn't do it. I refused."
        DT: "do you know the names of some of these individuals ?"
        WP: "He directed me to arrest Jennifer Jones on one occasion."
        DT: "for what?"
        WP: "her alleged false reporting to law enforcement when she had an incident with code enforcement officer. Michael Roth when he had an out of state plate on the front of his vehicle. It was an Oregon plate. So he said that's illegal. Vito Austin who had out of state plates he wanted him     cited for being a resident with out of state plates."

- 16 -

DT: "do you remember when he asked you to do all this?"
WP: "I want to say that Jennifer Jones … probably within the last six months."
Excerpt:
DT: "The Chief has aligned himself with the Town, City Council?"
WP: "The City Council"
DT: "totally?"
WP: "yeah pretty much"
DT: "Mayor and chief are at odds?"
WP: "right"
DT: "how about the town manager?"
WP: "she's with the Chief"
DT: "and obviously the City Council"
WP: "yes, and the assistant town manager also is intertwined in that mess"
DT: And he was a prior?
WP: Code enforcement officer, slash building inspector.
DT: and all the people that you were asked to target were politically against the
city council and the chief?
WP: "yes. That's when we started realizing there's a pattern here and we weren't
going to get involved in that."
DT: "… and we're basically talking about Jennifer Jones, Jack Jones, basically the
List..?"
WP: "Jennifer Jones, Jack Jones, Vito Austin, Richard Oldham, Michael Roth,
Sean and Laurie Austin" "Russell Sias … I heard Chief tell people that they
needed to stop him … These are all people that are either running for political
office or supported certain people in political offices or that were trying to run … "
Excerpt:
DT: about retaliation… during the five year tenure of the chief how much
retaliation have you seen if you oppose him?  When did it start?
WP:  … started about two years ago
DT: is that because he started getting involved in the politics within the town?
WP: yup. Everything was fine. He would … decent guy until the political … the
first time they tried to terminate him was when Steve Bennett was the mayor that is
when things changed. … that is when all this stuff started coming out. The mayor
did not like how he was doing business, the amount of money that was being spent
…
DT: … two years ago…?
WP:  yeah probably.
Excerpt:

DT: "Prior to that point had he ever asked you guys as officers to start targeting people or running …

WP: "No. not to my knowledge. "

DT: he never asked you or anyone else. And you probably would have heard from your other officers if he had been asking those officers directly to do that correct?

WP: yes. I believe they would have told me.

DT: …"as soon as he started doing that you started hearing from your officers"

WP: yup.

DT: they would call you up and start asking for advice?

WP: right.

DT: So prior to getting into politics he never asked you guys to do that?

WP: No.

DT: and he was ok to work for … normal …

Excerpt:  [regarding Matt Newman]

WP: "… they got rid of him because he would not prosecute the cases that we wanted … the Jennifer Jones cases. … retaliation against him for …"

79.  **2011 08 18 DPS Interview QPD Officer Heriberto Dominguez:**

DT = Detective  HD = Heriberto Dominguez

DT: Have you seen a change from the time you first started working with the Chief?

HD: A change in himself?

DT: A change in his policies, the way he does things the way he carries himself.

HD: Well the policies keep changing as per day, I've never been involved in the policy junk. The only thing I can say about him is he spends a lot of time over at town hall and politics that's what I say.

Excerpt:

DT: When in your mind did he start targeting these individuals?

HD: The individuals that he's targeting is when they started running for council or voicing their opinions about running for council.

DT: Ok and when would that have been?

HD: Probably late 09 or the beginning of 2010

DT: Prior to that did he ever ask others to pull people over?

HD: That's the only time he asked me. But other officers would say he had been asking them.

HD: "The chief started targeting individuals when they started running for council or voicing their opinions about running for council".

DT:  I'm going to give you some names Jennifer Jones, John Jones, Vito Austin, Sean Austin, Laurie Austin, Chaunce Hamilton, Russell Sias and Michael Roth. Are these some of the individuals that (Gilbert) may be targeting?

HD: The ones that are political John Jones, Jennifer Jones and Sias they were running for council at one time. Vito Austin I'm not sure what the story with Vito was. And then Laurie Austin and Sean Austin they are the parents of the girl Officer Starr was seeing.

Excerpt:

DT: do you routinely stop people for out of state plates?

HD: Michael Roth he's one of the political ones he has to voice his opinion he's got a big mouth. He was just being targeted because of his political background.

80.  **2011 08 30 DPS Interview QPD Officer Felipe Rodriguez:**

DT = Detective  FR = Felipe Rodriguez

DT:  now can you explain to us why you don't have any confidence in the chief? And why you voiced concerns? Regarding the police department?

FR:  Well I have worked under about 6 maybe 7 chief of police. I've never seen none of those chiefs to tell us to go target people out in our community. And when Chief Gilbert tells us who to target, selective enforcement. We can't do that. If somebody commits a crime we will go after that person and take care of the problem, but for Chief Gilbert to tell us to target certain people I don't know.

DT:  So during the entire time you were with Parker PD and Quartzsite prior to Chief Gilbert telling you that you've never had a  police chief or supervisor tell you to do that?

FR:  (laughing) No.

DT:  Why is it that selective enforcement bothers you?

FR:  Because there are certain people here in this community that was……….regarding the chief and the city council they are pretty vocal people here … bring issues in front of the town council and for some reason the chief doesn't like those people at all and he has told me and other officers to go against these people. To find out anything we can on them, to arrest them and do what ever we can do. And that's what I don't agree. I have presented some of the peoples names he told me to target.

DT:  And who would those people be?

FR:   I put here parties like Jennifer Jones, Russell Sias, Michael Roth and Mayor Foster. What bothers me is if these people are committing any crimes why are we waiting for them to show up at town meetings at town hall to make an arrest. It

seems to me improper to wait and make the arrest in front of all these people at are here. So that's something I don't agree with either.

DT: How many times has chief asked you to target certain people?

FR: "Not the supervisors at all. This comes from the chief of police himself. Michael Roth. The chief said I want him targeted, I want him pulled over, I want him cited

DT: Who is Roth?

FR: Michael Roth is one of your anti town council people. He's pretty vocal … permanent resident … he has tried to become a council person himself.

DT: Would the chief contact you at the station and say hey, Officer Rodriguez I want you to target Michael Roth because of this?

FR: Yes, in front of other officers.

DT:  So is he a Snowbird does he go back to Oregon

FR:  No he's a permanent resident and I know he has tried to become a council person himself. But he has not won any elections himself.

Excerpt:

DT:  So would the chief contact you at the station and say hey Officer Rodriguez I want you to target Michael Roth because of this?

FR:  Yes.

DT:  And are you by yourself is it like a briefing?

FR:  Oh there is other officers. And I thin you will hear that from other officers. To me I consider that selective enforcement. I don't agree to do. And why I brought this letter of lack of confidence against Chief Gilbert.

FR:  Do you want another example? On  May 10 2011 we did a drug bust on the interstate. This lady, Jennifer Jones came into the parking lot. She wants to videotape us while we make that arrest and confiscate all those drugs. And apparently one of the officers saw that she was there and told chief Gilbert and he got really upset. He pounded on her window "you need to get out of the car". So she got on her phone and called Mayor Foster. Foster came over and she finally opened her door and she gets arrested for trespassing right behind town hall. I was inside with the prisoner. I could hear a lot of screaming and yelling I thought what's going on. So I look outside and he is just really going off on the Mayor. And the Mayor is just walking away from him. He wanted nothing to do with him.

DT:  You mean the chief and the mayor?

FR:  Yes the Chief and the Mayor, but the one that I could hear being really loud was the chief. The Chief ordered the Mayor to get back in his car and leave. So Mayor Foster he complied he got in his car and left. And then, if he was to be arrested, he should have been arrested right on the spot; I don't know for disorderly

conduct, I have no idea. Well that arrest didn't happen. That arrest was made here in front of all these people when he was coming to a council meeting. The Mayor was coming to a council meeting, he gets arrested… To me it was like a show of force; tried to show the public who he is, you know, Chief Gilbert. Why wait? It was five days after that incident that Mayor Foster gets arrested. There's a report on it and all these charges against him. Why would anybody do that? If he committed a crime he should have been arrested behind town hall. I didn't agree with that either. To me that's like a show of force to show all these people, these citizens of Quartzsite, that he's the chief of police, he's the boss.

FR:  We have a promotion for sergeant and the chief calls me into his office and says, "You know, Rodriguez, this is your opportunity to tell me why I should elect you as a sergeant." First I said, "You know the morale in this department is really low." Chief: "Well, Why?" he said. First I said, "Well Chief, you are too politically motivated. You need to stay out of politics. We want you here at the police department not over at the town hall meetings; and always going against these people. Stay out of it chief you don't need to be in politics." Chief: "Oh, you don't understand. You have to look at the bigger picture."

FR:  I told Chief I have never had a Chief tell me to target certain members of the community. I won't do that. Chief: "those people are trouble makers"
Excerpt:
DT: Was Chief, always this politically motivated? Or was there a time when you actually enjoyed working for him?
FR:  I did. The first 2 years he was great. He wasn't doing politics. He was a great guy. I really liked and respected him. Then everything started going down hill when he started getting too much involved with politics. And then these people who dislike him, and dislike the town council, were causing a little bit of ruckus here at town hall and that's when he started getting upset and asking us to screw with them, you know.
DT: So approximately how long has this been going on that the chief has asked you to target certain people that oppose him or the town council?
FR: I can go back about 3 years.

81.   **2011 08 18 DPS interview QPD Officer Michelle Norris:**

DT = Detective  MN = Michelle Norris

MN: JG will go after people who are not on his political side.

MN: I've seen him target people, if it's someone that he doesn't care for in town he makes it known. It's not a big secret of who he likes and who he don't like. The chief made multiple comments about Vito Austin. Chief came up to me and told me he wanted him (Vito) cited because he had Washington plates on his truck, but it was ok when (Vito) was doing work at the department on the wall and stuff, but now it's not ok?

MN: there was an Injunction for harassment against Jones for blogging. "I want you to go down and arrest her (Jones) right now.", You want me to arrest her right now for something written on a blog that may or may not have been her?" And in addition to that, we don't go and arrest people off of orders like that ever. If it's an assault, yes to where someone's life is in danger or is being threatened. There is no urgency here.

 MN: He (Gilbert) also asked me one time, he said the Joneses were leaving Greasewood Creek because it was the end of the season and he wanted to know where they were storing their stuff because he wanted to know who was going to help them out and store their stuff. And if we see them on the road, I don't know if any of their stuff is plated or if they have drivers' licenses, "if you see them on the road stop them, I want you to identify them". Because I (Gilbert) don't believe Jack Jones is who he says he is. He had multiple contacts with him and he (Gilbert) was trying ever way he could to identify the guy because he didn't believe through his contacts because someone had dropped off something in a bag and said, "I think Jones prints are on this send it to the crime lab." And I believe he did! This is coming from people dropping it off at the department. They're not law enforcement; they didn't collect that properly. So he had been trying to identify him.

82.   **2011 08 18 DPS interview QPD Officer Stephen Frakes:**

 DT = Detective  SF = Stephen Frakes

SF: Wanted me to target a guy named Vito Austin.
DT: Did he say why?
SF: No, originally. NO. He kept saying, I know he's doing something illegal.

SF: The Chief was constantly after us, "Find something on Vito, Find something on Vito." The Chief, at the office, was always going, "I'll buy you dinner, I'll do this"
DT: If you find something on Vito?

Frakes: Yeah.

SF: Then he came to me and wanted an investigation on voter fraud. Primarily Vito, Vito's wife, Ed Foster, Russell Sias. I told him that's a conflict of interest, and he kept telling me "no its not". I talked to Bagby, and he agreed with me, and Chief Gilbert pressured on Bagby, and finally Bagby to Gilbert, "Okay, I'll have Williams do the case."

DT: Did the Chief allege to how he knew about the voter fraud, or what the voter fraud was?

SF: No.

83. **2011 08 11 DPS interview QPD Officer J. C. Kemp:**

DT = Detective   JK = J. C. Kemp

JK: on a barking dog.  They entered a residence without a warrant. So at that time they was a she was nasty about it you know she made a big stink about it and everything  like that and the Chief was gone at the time to FBI uh was going to FBI training things. So when he got back I was called in too in front of the chief by my sergeant and my sergeant asked me directly JC do we ever enter a residence without a warrant just for the welfare of a dog. I said absolutely not. If you're that concerned about a dog you got to go get a warrant. and that was the first time I ever heard about it. I actually picked the pieces of this later on. And the Chief shook his head and he says see I told you, you can't do it. You know, explaining to the Chief of Police that there was no reason for those officers to enter. And that apparently Sgt. Frausto gave them the OK to enter. So I think that's what the problem was. The woman made such a stink that uh the Chief said he would look into it and when he finally did at a town meeting I believe or some kind of public deal he told the town council that he had investigated the matter and that it was completely unfounded that there was any wrong done by the officers. And we knew from the beginning that there was something wrong. Because otherwise why would he even have bothered to question us?

DT: so that stirred the pot even more for Jennifer Jones.

JK: Right. She knew that a warrantless search had been done and all she was asking for then was an apology from the Chief of Police and from those officers. OK but now all of a sudden you just you just gave her a soap box and trust me that thing has been brewing for three years. So, ever since that time.

DT: OK

JK: None of the officers were disciplined and I don't know where they became the justification but it actually it actually got to the point where the La Paz County says our dog catcher doesn't even work for Quartzsite anymore. Or our dog catcher is not even allowed there. So. Whatever the case may be the officers on duty at the time the sergeant on duty at the time should have known better than to have ever entered that residence. If they were that worried about that dog they should have went down and got a warrant and say hey we believe the dog is suffering we need to go in and check we need a warrant to check the welfare of it. Or I don't even know if they would have even got it from a judge but if you're that concerned about it you should have done it the right way.

DT: the last time I checked exigent circumstances don't apply to dogs.

JK: Yeah. So she was in the right. And half the town at least half the town knew. So because she is very vocal wild dirty person. Nobody in the other half of the town knew didn't take her seriously. The town council did not take her seriously. Everybody just she ended up having to go get a lawyer on her own  to try and fight it come up with money to pay a lawyer. And the lawyer took one look at her and looked at how she dressed in all these tie dyed clothes and said you know what you pay me a whole bunch of money I'll represent you. Since then mistakes have been made where he is working for her pro bono now. So it's uh it's that kind of deal he's but he started that shit himself.

DT: So based on …

JK: In an effort to change that, and because now that she has a soapbox and people that will listen to her. She is trying to turn that into a political career here. So during that time she was running for office, during this election where the mayor was running, I believe it was at that time. And I actually have one of the council members who told me (when I reported this to 'em) you know "Well this isn't actually the chief's fault. It's the council members who are telling him "hey you go, get them. Go get them. They are talking bad about us. Go after them. Go get 'em". You know. And I said well that doesn't make it right. He knows what the law is and he knows he can't target specific people just because they are running against you in office. And she goes well you just got to understand the circumstances. I said well (laughs) circumstances is there is wrong and there is right.

Cowell told me "this isn't the chief's fault. He was told by people like Joe Winslow and Jerry Lukkasson go after them. Go get them." That's why he did the ACJIS violations was because he was told to by the Council. That's what she was trying to tell me.

JK: So, one of the instances was that is that after five o'clock at night which is after the business hours of this town and after the business hours of her dog

grooming business which was parked on a private lot they sent Mr. Johnson over there to take photographs to try to find any kind of violation town code violation they could charge this woman with

DT: So he basically works code enforcement?

JK: Yeah. At that time he was only the code enforcement officer.

JK: why did chief want stops? Selective enforcement. Prevent running for office. Personal reasons. On behalf of the City Council.

84.  **2011 08 18 DPS Interview QPD Officer Ruben Villafana:**

DT = Detective  RV = Ruben Villafana

RV: make arrests make traffic stops = problem with chief. aggressively talked bad about certain people in community. Mayor, Jennifer jones Jack Jones. Gilbert claims officers made alliance with the domestic terrorism people .. referring to … the list.

RV: …mainly it is his political involvement in the town. Telling us to target people in the community, make arrests, make traffic stops

DT:  did the chief any of his command staff or other officer threaten you in any way?

RV:  no.

DT:  as far as picking a side at any time?

RV:  Yeah they he's always, you know, pretty much aggressively talk bad about a certain people in the community which is you know, like the mayor, and Jennifer Jones, and Jack Jones and you know certain individuals and as far as recently, yeah, he has ever since we made our allegations; he says we made an alliance with what he calls the "domestic terrorism people".

DT:  and he is referring to the Mayor and his?

RV:  yeah the Mayor …

DT:  basically the "List"

RV:  yes.

DT:  Has he ever said why he doesn't like these people?

RV:  Pretty much because they are outspoken in the community. They are, I would say, they are just basically not afraid of him.

DT:  and do these people question his decisions at times?

RV:  Yes. Oh Yeah. Definitely. Many times.

DT: Why?

RV: They are outspoken, and not afraid of him. Question his decisions

85. **2011 08 18 DPS Interview QPD Officer Alejandro Rubacalva:**

DT = Detective  AR = Alejandro Rubacalva
AR: Chief JG would ask officers to keep tabs on certain officers so he could target them.

86. **2011 08 30 DPS Interview QPD Officer Herlen Yeomans:**

DT = Detective  HY = Herlen Yeomans

HY: Told to stop Ed Foster by Gilbert. For parking in a handicapped parking space. Turns out Foster has a handicapped permit…get another call from Gilbert who is parked at Pilot watching and tells him to get Foster. Gilbert wanted him to harass Foster.

87. **2011 08 18 DPS Interview QPD Officer Michelle Norris:**

DT = Detective  MN = Michelle Norris JG =Chief Gilbert

MN: License plate was run because it was parked in front of Jones's business.

MN: JG turned political. "that's my job"

MN: JG involved offices in political events. Ice cream social

88. **2011 08 24 DPS Interview QPD Evidence Technician Linda Conley:**

DT = Detective  LC = Linda Conley JG =Chief Gilbert

LC: JG wanted to run the Joneses after they returned from a trip
To see if they had done anything wrong while they were gone.

DT:  All these times you have run Jennifer Jones and her husband Jack Jones had you run them through the ACJIC system you're not sure they were ran for criminal purposes or they were not ran for criminal purposes do you have knowledge that at times they were ran for criminal investigative purposes and other times you're not sure?
LC:  Well yeah one time the chief said let's do a criminal history on these guys to see if they did anything while they were gone. Because they were 'snowbirds'.

What reason is that. That's not a valid law enforcement reason to run these guys to see if they did anything while they were gone for 4 months.

LC: JG was politically active and only ran people who were opposed to him. be more targeted because opposed council or chief

LC:  And what really triggered this whole thing off was Sergeant Frausto asked me to run a license plate and he has asked me since then to run a license plate and I've run them. And it came back to my neighbor. They are an older couple, they are snowbirds they are only here part of the year. But this year they had their daughter live with them. And she had a big dog and I have a big dog. I have snowbirds that live behind me and they are not real fond of my big dog. They have complained about my dog barking. I went home at lunch time and my dog is laid out sound asleep. The dog across the street was barking. So I called Frausto to come be a witness my dog is asleep and their dog is barking. When Frausto asked me to run the plate and it came back to the Skeltons and I asked somebody complained about their dog again? Frausto said No they were seen driving into Jennifer Jones's business. That's not a legitimate reason to run a license plate because a vehicle goes into a dog grooming business. …

DT:  During the time the chief became politically active. And those people we talked about getting ACJIS run on them. Had the chief had ACJIS run and computer related inquires on anybody else in town who had done more serious crimes?
LC:  No, not that I can remember. If there were serious things I would probably remember it. I can't think of anybody that he had me run. He may have had run Dispatch on serious stuff, he didn't have me run them.

89.    Upon information and belief, on August 2, 2012 (at QPD headquarters) Chief Gilbert and two police department employees (one probationary) discussed prior members of the "Citizens Coalition," namely, the Plaintiff (in this action) Douglas Gilford, Jennifer "Jade" Jones, and Michael "Mike" Roth who each had been arrested by the Town between June and September 1, 2011 and are now suing the Town for arrests without probable cause.

90.    Police recruit Anton Coetzee was hired by QPD part-time on October 17, 2011, about a month or so after eight 'whistle-blower' police employees (seven being sworn officers) had been fired.

91.    It is Mr. Gilford's understanding and belief that an audio of the Gilbert-Garcia-Coetzee August 2, 2012 conversation (excerpts below) exists/existed in the public record of the Town of Quartzsite (as recorded by QPD Sgt. Fabiola Garcia's "shoulder-cam" device).

92.    It is Mr. Gilford's further understanding and belief that the below (partial) transcription of the conversation (from a transcription submitted by ex-QPD police clerk Janet Brannan to the Governor's Office of Arizona around September 20, 2012) represents dialogue between Chief Gilbert, (now ex) Quartzsite Police Officer Anton Coetzee, and Coetzee's then supervisor Sgt. Fabiola Garcia.

93.    The August 2, 2012 transcript (as provided by Ms. Janet Brannan to the Governor of Arizona) is part of the Arizona public record and states as follows:

Chief Gilbert:  "Um, you know the other thing I'll just talk about real quick is, you know, uh, the politics of the, you know, town and stuff and uh, you know, I, I just, you know, ignore them.
Anton Coetzee: Night time

Chief Gilbert:  Yeah  you might not be here in another couple of weeks, or a few weeks or whatever and, and you know, all the new guys have had their initiation pretty much I think with, with uh, Jade or one of them, right; Jade or Foster or, or Gilford or somebody.

Anton Coetzee: Roth, Roth... I know

Chief Gilbert: Roth,

Sgt. Garcia (Coetzee's then supervisor): or Douglas

Anton Coetzee:  Yes

Chief Gilbert to Anton Coetzee:  Yeah

Sgt. Garcia (Coetzee's then supervisor) to Coetzee:  Well Brady had it with him, but Lancaster had it with the three of them.

Chief Gilbert to Anton Coetzee: Yeah, three or whatever

Sgt. Garcia (Coetzee's then supervisor) to Coetzee:  Because Jade introduced it, Ed Foster was there, Mike goes yeah, O.K

Chief Gilbert to Anton Coetzee: But, the bottom line is that, um, you know, a year ago, two years ago, um, you know, my attention was pulled away from the department because, not because I was involved in the politics, shit, because I had to try to support the Town Manager and the council people asking for help.."

94.    At the time of the above three-way conversation regarding Mr. Gilford, Mr. Gilford was concurrently being denied normal access to QTH, since July 3, 2012 based upon a spurious claim filed by the Town, through Defendant Mr. Johnson, in the Town's Magistrate Court requesting a Workplace Harassment Injunction Order against Mr. Gilford, which was granted immediately upon filing (the same day) July 3, 2012 by Judge Lawrence King. Judge King had been previously removed from all of Mr. Gilford's Quartzsite Magistrate Court criminal cases while the cases were pending trial. Judge King's removal was based upon Mr. Gilford's successful appeal for pre-trial  "change of judge" for cause made to the Presiding Judge (of La Paz Superior Court), alleging that Judge King had (in the least) displayed an appearance of bias against Mr. Gilford.

95.    In his aforementioned August 2011 interview with the Arizona Department of Public Safety, then QPD Officer James Kemp alleged that then-Quartzsite Code Enforcement Officer Mr. Johnson, had (in 2010) gone to the residence of Quartzsite citizen Jennifer Jones (who like Mr. Gilford, is a prior "Citizens Coalition" associate) for a purpose to "*rile her up,*" basically to harass Ms. Jones (without probable cause) under a pretense of enforcing "zoning regulations."

96.    This episode of harassment of Jones (by Mr. Johnson) was quite similar in verbal nature, physical manner, selective interfering with and physically-obstructionist actions of Mr. Johnson toward Mr. Gilford which have been displayed by Mr. Johnson when Mr. Gilford has attempted (during 2011) to conduct legitimate visits and business at QTH for personal and business reasons.

97.     On or about July 13 to 19 of 2011, Mr. Gilford filed four separate factual complaints with the Quartzsite Police Department, one being a complaint that Assistant Town Manager Al Johnson interfered with Mr. Gilford's business in QTH on July 13 2011.

98.     On August 19, 2011, on behalf of the Town, Town Prosecutor Martin Brannan charged Mr. Gilford in Criminal Case #2 of 3 (CR20110097) with filing a false report for filing the complaint regarding the July 13, 2011 events involving Mr. Johnson.

99.     On September 1, 2011, Mr. Gilford approached a business window at QTH and exchanged greetings with three employees on the business-office side of the partition-window.  Mr. Gilford reached for a self-service display of blank Public Records Request forms, took a standing position at the counter, and proceeded to use the ledge surface to prepare a Request form for a public record he was seeking.

100.    Mr. Johnson was not in sight. However, once again as before, Mr. Johnson presented himself in front of Mr. Gilford and insisted on interfering with Mr. Gilford although Mr. Gilford was seeking direct assistance from no one.  In this instance Mr. Johnson approached the window from the office-side and insisted Mr. Gilford communicate with Mr. Johnson while Mr. Gilford was still attempting to complete the paperwork.

101.    Mr. Gilford felt an imminent need he may need to document the developing circumstances due to the insistent demand from Mr. Johnson that he must then and there "assist" Mr. Gilford and that Mr. Gilford must submit to his "assistance", despite the fact Mr. Gilford had asked for no help whatsoever.  Mr. Gilford powered-up a camera device which he almost always has with him, but he did **not** activate the device into record mode.

102.    Upon seeing the camera in Mr. Gilford's hand, Mr. Johnson suddenly snatched the camera from Mr. Gilford's hand by force and then held it behind his (Mr. Johnson's) back so Mr. Gilford could not retrieve it.  Suffering unlawful seizure of his personal

property (without warrant or just cause), Mr. Gilford decided to call 911 so as to get his camera back. While Mr. Gilford was already in the call process with 911, to report his camera had been snatched, Mr. Johnson set the camera back on the counter near Mr. Gilford. Mr. Gilford remained in the lobby area on the opposite side of the partition from Asst. Town Manager Johnson, and was still connected to dispatch when Mr. Johnson began making sounds similar to that which a bleating-goat might make.

103.   At 15:38 Mr. Gilford retrieved his camera from the counter ledge and departed to the outside of the building to await a police response the dispatcher said would be forthcoming, outside the building.

104.   Concurrent to Mr. Gilford awaiting a QPD officer arrival outside the building, Mr. Johnson separately contacted QPD Sgt. Xavier Frausto regarding the matter.

105.   Ofcr. Rodriguez arrived on the scene. Unbeknownst to Mr. Gilford, he had actually been waiting to be falsely arrested by Quartzsite Police Ofcr. Rodriguez who had been ordered by Sgt. Frausto to immediately arrest Mr. Gilford on the spot for charges of trespassing, harassment, and false reporting.

106.   Afterwards, Officer Rodriguez took Mr. Gilford's personal property (which included private papers and Mr. Gilford's camera) and Mr. Gilford's personal papers were passed by Defendant Officer Rodriguez to Defendant Sgt. Fabiola Garcia, who then disappeared with Mr. Gilford's personal papers.

107.   During the seizure of Mr. Gilford by Officer Rodriguez, the following warning was heard by Mr. Gilford and captured on Mr. Gilford's audio recorder:

> "Turn around for me you're under arrest. Now you have – you gonna go to jail and you gonna get booked in. You gonna feel what it is to be in custody. OK, sir? And next time you come here, and I'm working, once again I'm gonna take you back to jail."

108. At trial (July 3, 2012), in **Criminal Case #3 of 3  (CR20110103)**, relating to Mr. Gilford's September 1, 2011 false arrest, prosecutor Mr. Jones asked Officer Rodriguez pertinent questions and received responses, as follows:

> MR. JONES: Did you think that you had probable cause to arrest Mr. Gilford for trespass?
>
> OFFICER RODRIGUEZ: Uh, I had **not done an investigation** with … I was just **under orders** to make the arrest by Sergeant Frausto.
>
> MR. JONES: So you didn't really make any independent judgment of your own whether or not the probable cause existed?
>
> OFFICER RODRIGUEZ: Before I arrived at Town Hall, I have, a received a phone call from Sergeant Frausto to make an arrest and then I got a text message from Sergeant Frausto … **I need to arrest Mr. Gilford also certain charges.**
>
> MR. JONES: No further questions."

109. A total of sixteen misdemeanor counts (without probable cause) were pending upon Mr. Gilford's September 1, 2011 arrest, brought by the Town in a twenty three (23) day period. The alleged plaintiffs and/or alleged victims (in all sixteen counts) were either elective officers of the Town or employees of the Town of Quartzsite. Prior to his September 1, 2011 arrest for which Mr. Gilford was charged with three counts (trespassing, harassment, false reporting) in the Town's Magistrate Court, Criminal Case #3 of 3, (CR20110103), Mr. Gilford was already being maliciously prosecuted for thirteen other misdemeanor charges in two cases: Criminal Case #1 of 3 (CR20110093) & Criminal Case #2 of 3 (CR20110097) in the same court. Criminal Case #1 & Criminal Case #2 were previously filed against Mr. Gilford by the Town Prosecutor (respectively filed August 10 and August 19, 2011).

110. Mr. Johnson (then serving as Assistant Town Manager) announced at a "Town Hall" panel-styled meeting of Town Officials and staff (**in late Fall 2011**) that Judge King was an "Ivy League" graduate and that *"[t]he games are over at Quartzsite Magistrate Court,"* suggesting new Town Magistrate, Judge King, would be making future judicial rulings and managing the court under some kind of special influence of the 1. Town council (who selected Judge King as their unelected Magistrate) and 2. other

Town officials (Prosecutor and police chief) who did not have such influence over pro tem Magistrates serving the Town Magistrate Court.

111.   The same day of the dismissal and/or acquittal of the remaining of the initial sixteen charges, the Town immediately, acting through Assistant Town Manager Johnson swore out a statement to obtain a Workplace Harassment Injunction against Mr. Gilford. The petition for the injunction included false information about Mr. Gilford's past conduct at QTH and speculative fears (colorfully described rhetoric) about Mr. Gilford's potential future conduct claiming Mr. Gilford to be "emboldened" by the trial results (his acquittals that same day) would exercise his constitutional rights (especially First Amendment rights) in some speculative future manner that might harm the Town (or harm other imagined others).

112.   On July 3, 2012, the same day Judge Sherwood Johnston III acquitted Mr. Gilford of false reporting, harassment, and disorderly conduct a Workplace Harassment Injunction was granted by Judge Lawrence King excluding Mr. Gilford from QTH and its premises until Mr. Gilford had the order quashed.

113.   Mr. Gilford, a real estate broker who often needs access to QTH (especially the Planning and Zoning department to inspect maps and documents relating to his professional real estate services for clients) was thereby excluded from access in his normal course of business to the complete services of his local government (other than by email, mail or fax) for several weeks until Mr. Gilford finally obtained legal representation to defend himself and to get the Injunction quashed.

114.   Defendant Martin Brannan ("Mr. Brannan"), pursuant to his own "whistle-blower" complaint to the Arizona State Personnel Board, admits he was hired to be a "***hard ass town attorney***" (who had replaced longtime Town prosecutor Matt Newman). Mr. Brannan well-served as a means to effect civil conspiracy against the political targets, including Mr. Gilford, as Mr. Brannan provided an alternative to the Town's repeated and frustrated attempts to cause the prosecution of the political targets of the Council with

felonies because County Attorney Vederman was refusing to prosecute numerous felony arrests and investigations being forwarded to him by the Town in regards to the "targets." In his January 3, 2012 letter (to FBI Agent Farley) Vederman addressed the issue:

> " 1. Chief Jeff Gilbert has requested felony charges against certain citizens for which I believe no criminal conduct occurred, or, at the very least, did not rise to the level of felony conduct: Russell Sias (Aggravated Assault on a Peace Officer), Jennifer Jones (Influencing a Witness), Michael Roth (Resisting Arrest) and Ed Foster (Obstructing a Criminal Investigation).   2.  It is my belief that the arrest of Ed Foster (the former Town Mayor) for conduct that arose out of the same incident in which Chief Gilbert requested Mr. Foster be charged with felony Obstructing a Criminal Investigation, was a politically motivated arrest…(sic) 4. Chief Gilbert formally requested that this office no longer prosecute misdemeanor cases in which the QPD is involved and his request occurred after Mr. Newman was fired.  5. Chief Gilbert has requested that this office conflict off of certain felony cases, referred to this office by the QPD, in which there is no conflict of interest."

115.   January 15, 2012, Mr. Brannan issued a "Town Attorney" press release to the public labeling and naming several citizens (prior "Citizens Coalition" associates) as "self styled activists."  All those named in the press release by Mr. Brannan were at the time being prosecuted (without probable cause) for various alleged misdemeanor offenses by the Town, namely, Mr. Douglas Gilford, Ed Foster, Jennifer Jones, and Michael Roth.

116.   Days later, on January 24, 2012, during a public council meeting in progress, Mr. Brannan read a prepared statement affording Mr. Brannan an opportunity to call Mr. Gilford a liar. Mr. Brannan was then present at the Council meeting in his capacity as the Town Attorney and Town Parliamentarian.

117.   Indeed, Mr. Brannan was only underscoring and participating in the ongoing conspiracy to politically target and charge prior "Citizens Coalition" associates with criminal counts (without probable cause)  and expressed the malice and animosity which then town council members ( who hired him to be "*hard ass*") held against the most 'vocal' associates of the prior organized "Citizens Coalition."

118.    By the time of Mr. Brannan's hiring in Spring of 2011, for more than two years prior Citizens Coalition associates had been recording (via Audio/video) Town activities, publishing about Town activities, protesting about Town activities, and speaking out about Town activities, in the face of being invidiously discriminated against and distinctly labeled on June 22, 2010, by Council member Joe Winslow as a "*radical organization*" operating "*a conspiracy to commit sedition,*" as "*dedicated nihilists,*" and "*anarchists.*"

### Criminal Case #2 of 3 (CR20110097)

119.    On or about July 13-19 of 2011, Mr. Gilford filed four separate factual complaints with the Quartzsite Police Department regarding Town Manager Taft, Police Sgt. Fabiola Garcia, Council member Jose Lizarraga, and Assistant Town Manager Mr. Johnson.

120.    On August 19, 2011 on behalf of the Town, Mr. Brannan brought charges against Plaintiff for False Reporting (6 counts), Harassment (2 counts), Disorderly Conduct and Trespassing in QTH. July 3, 2012, Judge Johnston III acquitted Mr. Gilford on all remaining charges for no prima facie case.

121.    Defendant Fabiola Garcia ("Garcia") at all times relevant, held the position of Officer and or Sergeant in the QPD and acted under color of state law in causing events to occur in the Town out of which this complaint arose.

122.    Sgt. Garcia has stepped up to assist in the arrests of political targets when other Quartzsite officers either refused to arrest and/or refused to pen criminal reports against the targets, upon the request of the Chief.

123.    On or about July 13-19 of 2011, Mr. Gilford filed four separate factual complaints with the QPD. Plaintiff complained that Police Sgt. Fabiola Garcia refused to assist Mr. Gilford on July 13, 2011 while Mr. Johnson harassed Mr. Gilford at the QTH and blocked Plaintiff's path to the business counter in QTH. Garcia was present and did not respond to Mr. Gilford's plea to curb Mr. Johnson's behavior.

124.   On August 19, 2011, on behalf of the Town, Town Prosecutor Martin Brannan charged Mr. Gilford in Criminal Case #2 of 3 (CR20110097) with filing a false report for filing the complaint regarding the July 13, 2011 events involving Sgt. Garcia.

125.   Mr. Gilford was approached and engaged without cause by Sgt. Garcia on August 23, 2011 outside of QTH for being "offensive" (in her opinion) because Mr. Gilford was taking a photo of a bulletin board bearing public notices.  Sgt. Frausto assisted Sgt. Garcia in the interference with Mr. Gilford on August 23, 2011.

126.   Defendant Xavier Frausto ("X. Frausto") at all times relevant was employed as a Sergeant in the QPD.

127.   Frausto interacted with Mr. Gilford in a manner that harassed Mr. Gilford on the following dates:

1.   2011: July 8 In QTH Sgt. Frausto and Chief & 2 officers respond to video camera complaint made by a town employee against Mr. Gilford.  July 10 Sgt. Frausto barred Mr. Gilford and Jennifer Jones from entry to QTC council meeting underway in QTH. July 12, Mr. Gilford accosted in QTH by Sgt. Frausto who inquires "do you have business?" July 15 In QTH Sgt. Frausto denied Mr. Gilford use of video camera near public business window. July 15 Later in day QTH Sgt. Frausto forbade Mr. Gilford on his second visit to use video camera in entire building.  August 23 Outside QTH Sgt. Frausto approached Mr. Gilford: "But don't be taking peoples' pictures …".  August 23 (2nd contact) In doorway of QTH Sgt. Frausto refused to take Mr. Gilford's report of assault. "… Close the door – air conditioning."  September 1 Sgt. Frausto commanded Mr. Gilford's arrest after Mr. Johnson made a complaint about alleged video camera use in QTH.

2.   2012: February 28 Sgt. Frausto enforced camera restrictions against video camera or audio recorder from public seat at Council meeting (no sign posted of rules in room). February 28 (2nd incident) Frausto insisted that Mr. Gilford not video record  him

from the press area either. June 4 Sgt. Frausto forbade Mr. Gilford the right to video record him on duty at Quartzsite Council Meeting .

128.   Frausto testified at the July 3, 2012 trial of Mr. Gilford, regarding the September 1, 2011 arrest and seizure of Mr. Gilford, as follows:

MR. CAMPBELL: Did you receive a phone call from Mr. Johnson September first?

SGT. FRAUSTO: Yes.

MR. CAMPBELL: What did Mr. Johnson tell you

SGT. FRAUSTO: That Mr. Gilford was in there causing a commotion at town hall.

MR. CAMPBELL: What else did he tell you?

SGT. FRAUSTO: Nothing. That's the best I can recall.

MR. CAMPBELL: Did he tell you that Mr. Gilford had a video camera in the town hall lobby?

SGT. FRAUSTO: I can't recall that.

MR. CAMPBELL: Do you remember giving me a statement last week?

SGT. FRAUSTO: Yes.

MR. CAMPBELL: Do you remember telling me in your statement that Mr. Johnson told you that Mr. Gilford was videoing in the lobby?

SGT. FRAUSTO: If I did I can't recall that.

MR. CAMPBELL: In response to Mr. Johnson's phone call did you give an order to Officer Rodriguez?

SGT. FRAUSTO: Yes I did.

MR. CAMPBELL: What was that order?

SGT. FRAUSTO: To place Mr. Gilford under arrest.

MR. CAMPBELL: You made that order without doing any investigation on your own other than hearing a phone call from Mr. Johnson?

SGT. FRAUSTO: Well the ... he did in the past

MR. CAMPBELL: As it pertains to September first did you … the incident as it was reported to you by Mr. Johnson September first 2011 did you do any more investigation about that particular incident before you ordered the arrest of Mr. Gilford

SGT. FRAUSTO: No like I say I was going by what he did in the past.

MR. CAMPBELL: Judge I would move to strike anything about incidents in the past.   There's no evidence …

THE COURT: Sustained.

129.   September 1, 2011, at the jail while Mr. Gilford was being booked, Officer Rodriguez completed a "Release Questionnaire" containing the officer's "Probable Cause" for the arrest.   Upon information and belief, Sgt. Frausto instructed Officer Rodriguez as to how to word the Probable Cause statement to make it appear Mr. Gilford had trespassed at QTH after being allegedly told "to leave," which is an absolute falsehood.

130.   After getting a phone call from Mr. Johnson (confirmed by Sgt. Frausto and Mr. Johnson's testimony at Mr. Gilford's July 3, 2012 trial), Sgt. Frausto ordered Defendant Felipe Rodriguez to arrest Mr. Gilford (confirmed by Sgt. Frausto and Ofcr. Rodriguez' testimony at Mr. Gilford's July 3, 2012 trial) without probable cause or even minimal investigation of the facts.

131.   Defendant Felipe Rodriguez ("Ofcr. Rodriguez"), at all times relevant was employed as a police officer in the QPD. Ofcr. Rodriguez was party to the group of Quartzsite police officers who in May 2011 had filed a complaint with AZPOST (as a

group) against Chief Gilbert, complaining that they were being used or expected to violate the civil rights of certain targeted citizens.

132.   In the DPS criminal investigation of Chief Gilbert, Ofcr. Rodriguez made the pertinent statements set forth above that he was being used by Chief Gilbert to violate citizens of the Town of Quartzite's constitutional rights.  The aforementioned excerpts are 'haunting' in light of the circumstances of Mr. Gilford's arrest (without probable cause or any investigation) by Rodriguez – performed only two days after Ofcr. Rodriguez' DPS interview regarding Chief Gilbert.

133.   Ofcr. Rodriguez testified at the trial (July 3, 2012) of Mr. Gilford's September 1, 2011 arrest charges, that he had no probable cause, nor true material facts to support the charge of trespassing, despite Ofcr. Rodriguez's  Probable Cause Statement alleging trespass.

134.   Only the falsehood in the Probable Cause Statement about Mr. Gilford being told "to leave" and allegedly "refusing to leave" QTH on September 1, 2011, gave the arraigning judge a basis to hold Mr. Gilford on the false trespassing arrest & trespassing charge.

135.   Defendant Joseph Michael Winslow ("Winslow"), at all times relevant, was an elective official, a Town Council member for the Town of Quartzsite.

136.   When (on June 22, 2010) Council member Winslow called for the resignation of then Mayor Ed Foster (a prior "coalition" associate who had been elected Mayor in early 2010) for editing/publishing the online Quartzsite-focused news website, the "Mineshaft," Council member Winslow stating at the June 22, 2010 council meeting to the public (excerpt from beginning of council member Winslow's  statement) the following:

> "I'm asking for the Mayor to resign his office for the following reasons; for continuing to align himself with the reform coalition group as its nominal head, this is diametrically opposed to the mission of this town, and as editor of the newspaper, The Mineshaft

Members of this radical organization are engaged in an ongoing conspiracy to commit sedition, and have been for at least year. Their objective is the elimination of all elected town officials and selected town staff, I.E., the town manager and chief of police, among others; and replace them with their anarchist counterparts, by any means necessary.

Their methods vary, but for the most part consist of disruption during council meetings by shouting or talking loudly in hopes of gaining a forum to argue their views. Lately, the have been blocking access to the public podium by attempting to intimidate citizens who wish to address the council. It's easier to intimidate by leaning on the wall than sitting in a chair, f you enjoy that sort of thing. Other methods include dissemination of false information, such as disinformation, misinformation, perception management, and when all else fails, outright lies.

The Mayor and members of this group have brought several lawsuits against the town, its staff, and members of the council. To date all have been dismissed, either due to a lack of evidence or because they were lacking in merit. This group, while represented by Hal Davidson, has threatened to recall any council member who does not resign.

As Mr. Davidson has a lot of experience in this area, being responsible for at least five recall elections at the cost to the town of thousands of dollars, I take his threat seriously. I cannot, however, take Mr. Davidson seriously. I react poorly to threats. I refuse to resign

The Mayor, and members of his group of dedicated nihilists, have submitted many, many public information requests over the last year or so. These inquiries are part of a fishing expedition and partly an attempt to divert town staff from other more pressing duties, I.E. serving the people of Quartzsite."  End transcription excerpt.

137.   Approximately one year later (May 18, 2011), at a "Town Hall" meeting the Town and Winslow rhetoric was still flowing against the "dissidents:"

**May 18, 2011 "Town Hall meeting"**

Meeting: Panel includes Joe Winslow (JT), Alex Taft (AT), Al Johnson (AJ),
            Commentator {CO}

JW: can I mention the cost involved?

AT: sure

JW: the last year.. we spent on THE DISSIDENTS for lack of a better word.. its $46,000.

AT: I need to correct that. It's not the dissidents it's our Mayor.

JW: Oh it's just one man I stand corrected.

AT:  yeah.

JW: that's his cost… the other thing.. interesting is that we have a whole stack of
        Freedom of Information requests like that. For the most part RIDICULOUS.
EXCEPT we had one of our staff put it all together and it started to make
no sense to me. This is all going in one direction which basically is bad for
the Town . not going to get into that. If you stop and think about all the man
hours required to respond to those FOI requests that means we are paying
somebody about 8, 8, 10 dollars an hour to spend all day two days a week
whatever researching each one of the damn things. Like I said there is a
stack like that and there is no way you can quantify that. You can't say it is
800 man hours. Ten thousand man hours. Nobody really knows. As far as
the chief was in here … you know as far as the department doing their job
... they are being threatened you need to know that Council as it consists
… we have been threatened with lawsuits you name it. We are still here.
We are still going to do our job.

JW: nobody is going to bully us. I am going to talk to Mr. Vederman about how he
        could ignore our requests for a year and a half or two years … investigate
these  people and they come down on us in response to a letter that the Mayor sent.

CO:  How do you hold steady while sustaining blows of persecution? What are
your secrets for staying the course? JW: I am a saint. [laughter]

AJ: where else can you get this entertainment for free?
JW: free?
AJ: I am not going to say it is an adrenal run actually it is a drain. … you have no
idea what comes through that door. [back patting session] … overwhelming…can't
pay for this kind of experience… you would like to see it end. I was the one who
asked that a list be compiled of the mayor's request forms. I went through each and
every one of them. I gave them to the town manager.  Some of it is just you know
it's RIDICULOUS. Some of it is pretty well aimed. And you really wonder  where
some of this information  how THEY get some of this information. There is
almost like a psychological side of it.  But uh I got to tell you it is fun day you ….
(refers to AT town manager)

### Criminal Case #1 of 3 (CR20110093)

138.   On July 27, 2011, elective Council member Joe Winslow walked past Mr. Gilford in the parking lot of QTH. Events which followed led to Winslow making a written complaint to QPD for harassment against Mr. Gilford.

139.   Prosecutor Brannan wrote "The Quartzsite Town Prosecutor accuses" Mr. Gilford of 3 counts of harassment in a criminal complaint in Quartzsite Municipal Court (Formerly Quartzsite Magistrate Court) on August 10, 2011.

140.   At about 9:00 in the morning on July 27, 2011, Mr. Gilford was talking with Stephen Frakes, a certified peace officer, and Linda Conley, police evidence technician in the QTH parking lot. Mr. Gilford had a political sign ("Go. Quit. Resign.") in the back of his parked truck to which Winslow dedicated five handwritten lines in his victim witness statement / written complaint. Winslow alleged that people would have to "walk around it" even though the truck was properly parked "front and center" where all could see in a marked space, nothing projecting.

141.   Council member Winslow passed by on foot. Mr. Gilford asked "Councilman could I please ask you a question?" Winslow rebuffed Mr. Gilford's request and Mr. Gilford returned to his previous conversation. Later that day, Winslow reported this brief exchange with Mr. Gilford to Sgt. Frausto in a written harassment complaint.

142.   Hours later, at around noon that day, Mr. Gilford went to the local post office to pick up his mail. Council member Winslow showed up just after Mr. Gilford.  Mr. Gilford asked "Hello Councilman. Could you please tell me why the Council has not put the Chief on suspension?"  Again Winslow rebuffed Mr. Gilford, now with colorful speech. Despite the fact that Winslow arrived after Mr. Gilford, more than two hours after the morning's event, Winslow later reported this exchange with Mr. Gilford in writing to QPD.

143.   Sgt. Frausto's Incident Report in this case led to charges including one for misdemeanor Harassment - Following. Mr. Gilford left the Post Office at about 12:10

pm, before Winslow. He drove down Main Street and then parked on a side street by the fence of the "Eatery" restaurant. He stood there and photographed cars in the parking lot. Within a few minutes, Winslow drove into the parking lot and Mr. Gilford observed that through the viewfinder of his camera. Winslow then entered the Eatery.

144.    Minutes later Mr. Gilford's name was heard by others on a police scanner radio receiver. Upon information and belief, Sgt. Frausto and Chief Gilbert were inside the restaurant with at least one Council member, Barbara Cowell (police vehicles and Cowell's vehicle in parking lot).

145.    Winslow made a written police complaint about Mr. Gilford for this event. Winslow and Sgt. Frausto alleged two criminal acts of harassment against Mr. Gilford in the written police report.

146.    Defendant Alexandra Taft ("Taft"), at all times relevant, was employed as Town Manager for the Town of Quartzsite.

147.    On or about July 13-19 of 2011, Mr. Gilford filed four separate factual complaints with the Quartzsite Police Department. Plaintiff complained that Town Manager Taft had violated her own posted rule regarding no camera use in QTH on July 12, 2011.

148.    On August 19, 2011, on behalf of the Town, Town Prosecutor Martin Brannan charged Mr. Gilford in Criminal Case #2 of 3 (CR20110097) with filing a false report for filing the complaint regarding the July 12, 2011 events involving Ms. Taft.

149.    On Aug 22, 2011, in a sworn statement made by Ms. Taft and soon after submitted to the Arizona Attorney General's Office (AG) pursuant to an investigation then underway at the AG's Office. Then-Town Manager Taft alleged an event where Mr. Gilford had sought to attend a July 10, 2011 Council meeting and was summarily denied entrance and participation by the police officer guarding the locked door to the Council Chambers. Taft's sworn statement described the circumstances of July 10, 2011 at QTH, and made defamatory accusations regarding Mr. Gilford, placing him in a false light, as follows:

"The perception of an emergency brewing began within a day or two of the June 28th meeting. Other Town Officers and employees and I had heard rumors that the video of Ms. Jones had gone "viral" and vicious comments were being posted about the police and the Council online. The websites we monitor, i.e., Ms. Jones', Doug Gilford's, Mayor Foster's and Richard Oldham's, all had statements of an incendiary nature regarding the meeting."

"The only other people who approached the door were the same people who had spearheaded the disruption of prior meetings, the same people that sent the video of the June 28 meeting to the anti-government web sites and the same people who had tried repeatedly, with the Mayor's support, to unseat the council through a failed attempt to recall the Council, i.e., Doug Gilford and Ms. Jones."

"The tools that Gilford and Jones, along with others like Dean Taylor and Michael Roth, were harassment, heckling, making false statements, following Council Members around with video and still cameras, and bullying. Those tactics were not limited to council; they included staff and people who supported the council and attended the meetings peacefully. This is why the doors remained locked."

"We only had one officer on duty."

150.   Thomas W. Jones ("Jones"), at all times relevant, was employed and/or contracted with the Town as Special Prosecutor to temporarily replace Town Attorney/Prosecutor Brannan in the prosecution of Mr. Gilford.

151.   Jones insisted on prosecuting Mr. Gilford for at least one count to get a retaliatory conviction the Town wanted, no matter what.  The March 2012 emails between the Town Manager and Jones about Ed Foster's charges show the Town Manager was involved in trying to "shop" for a prosecutor on behalf of the Town.

152.   Tom Jones made a "pick a card" style plea offer to Mr. Gilford at the March 28, 2012 mediation conference requested by Judge King. Just Mr. Jones and Mr. Gilford met in a room. Mr. Gilford's perception is that Mr. Jones' plea offer indicated that he might have been  trying to satisfy Town Manager Taft by procuring at least one conviction in Mr. Gilford's case.

153.   Mr. Gilford will always remember Mr. Jones for his "***pick a card" plea offer***.  If Mr. Gilford would just plead guilty to any one of the counts against him (of thirteen then pending), Mr. Jones would move the court to dismiss all the others.

154.   Defendant Laura Bruno ("Bruno") at all times relevant, since her appointment as "Interim" Town Manager and as the regular Town Manager, has overtly acted to suppress Mr. Gilford from exercising his First Amendment rights.

155.   Bruno issued a letter on October 10, 2012 to Mr. Gilford stating restrictions which unreasonably restrict his use of a video recording camera. The letter instructs or warns Mr. Gilford, "*While at Town Hall meetings … you may not videotape the audience … unless you have the express permission of each individual …."*  This is directly contrary to Arizona's open Meeting Law, A.R.S. §33-1804 which specifically protects an attendee's right to tape record or videotape when attending QTH Meetings.

156.   Given Bruno's policy/rule at QTH Council and other meetings, that camera and video recording (even with a camera no larger than a cell phone) may only be done from the rear of the meeting room, it is physically impossible to video record only the public officials at the front of the room without capturing part or all of all those in the public seats in the camera lens. Mr. Gilford owns a small handheld snapshot-sized camera (with a footprint about the size of a cell phone) and certainly the use of an item this size, if held against the face while seated in his chair in the audience, is no more objectionable to others than wearing sunglasses over the face.

157.   Prohibiting operation of small cameras / recorders from a public seat at a council meeting serves no legitimate governmental interest nor public safety nor public health purpose.

158.   On February 8, 2013 Mr. Gilford, accompanied by Quartzsite Council Member Patricia Workman, entered QTH for a 9 am appointment to view a public record which he earlier had formally requested on October 2, 2012. Now both were seated together at a table with an attendant because the Town forces the public to inspect public records while

accompanied by a Town staff person. Mr. Gilford began to take notes and to read the document aloud to Council member Workman. Ms. Bruno approached Mr. Gilford and insisted that no audio recording was to be done. Mr. Gilford and Council member Workman left the building without finishing the planned review. No signs were seen posted in the building forbidding audio recording.

159.   On April 8, 2013 Ms. Bruno's appointee (Town Clerk T. Frausto) then enforced Ms. Bruno's 'no audio recording of any kind policy' in the same room used in the event of February 8, 2013 (above).  Ms. Frausto said something to Mr. Gilford to the effect of "you understand you are not to be recording? I am not to be recorded, Alright?" Mr. Gilford asked Ms. Frausto, a question to the effect, "What would happen if I did record, would you arrest me?" Her answer was vague, more or less, stating, "I can file something against you" which Mr. Gilford took to be something on the order of a criminal charge or an injunction, having previously experienced both from the Town. Ms. Frausto did not make that clear.

160.   Mr. Gilford has the statutory right to tape record any conversation he is part of pursuant to A.R.S. § 13-3005 and 18 U.S.C. § 2511(2)(c).

161.   Patricia Anderson, at all times relevant, has served in her capacity as former Town of Quartzsite Council member.

162.   On January 3, 2012 in his letter to F.B.I. Agent Farley, then La Paz County Attorney Vederman (now Judge) commented about Council member Anderson taking a public position in regard to Mike Roth (prior member of the Citizens Coalition), quote:

The Town, through Council member Patricia Anderson, publicly criticized this office for declining to prosecute Michael Roth for an incident that took place at a Town Council meeting in June 2011. It is the same incident in which Chief Gilbert requested this office charge Mr. Roth with felony Resisting Arrest.

163.   QPD Police Clerk Linda Conley Letter dated June 25, 2011, describes the politicking going on in the Quartzsite Police department in the 2010 election cycle. Conley writes:

> Chief Gilbert has involved himself and the department in town politics against Town Policy. When Patricia Anderson was running for a council seat, she came into the office for a meeting with the chief. He came out of his office with a stack of business type cards, political campaign paraphernalia of Anderson's and told me to pass them out to all the officers. When Officer Norris and I showed him the section in the Town Quartzsite Personnel Policy Handbook (Section 202, pf 10) which prohibits political involvement he said never mind and took the cards back.

164.   Barbara Cowell, at all times relevant, was a member of the Town Council.

165.   On Aug 25, 2011, a sworn statement was made by Ms. Cowell and soon after submitted to the Arizona Attorney General's Office (AG), pursuant to an investigation then underway at the AG's Office.  In the statement, Council member Cowell (who was and is a real estate agent with a competing agency to Mr. Gilford's real estate agency) alleged an event where Mr. Gilford had sought to attend a July 10, 2011 Council meeting and was summarily denied entrance and thereby participation at a locked door to the Council Chambers (the door then being guarded from the inside by Quartzsite Police Sgt. Xavier Frausto).  Cowell's August 25, 2011 sworn statement to the Arizona Attorney General alleges circumstances of the July 10, 2011 council meeting at QTH, and makes defamatory accusations regarding Mr. Gilford, placing him in a false light, and outright suggests that "*letting*" Mr. Gilford "*in the building with only one police officer to keep the peace could have led to unnecessary violence.*" Cowell further stated:

> "There were only three people who approached the door while the meeting was in session. One was the mayor who refused our invitation to come in. The other two were Ms. Jones, who under our town code was prohibited from attending this meeting after having been removed from the last one, and **Doug Gilford, who was responsible for posting the video on the internet in the first place**"

"Mr. Gilford has a history of allegations of harassment and disorderly conduct, following Council Members around and shouting questions at them after being asked to stop, intimidating people by getting in their faces and has a reputation of being capable of violence. Under the circumstances, letting either of those two people {meaning Mr. Gilford and Jennifer Jones} in the building with only one police officer to keep the peace could have led to unnecessary violence."

166.   Defendant Norma Crooks, at all times relevant, in her capacity as Town of Quartzsite Council member, conspired with other Council members presently on the Town Council, as named in the caption above, to create and sustain unconstitutional policies and/or unconstitutionally vague policies with no legitimate government interest of the Town regarding the use of audio recording, video recording, and camera-type devices in public access areas of QTH, Town campuses, and facilities of the Town, so as to have such policies inflicted upon Mr. Gilford by Town administrative management and/or Town employees when Mr. Gilford attempts to assert his First Amendment Constitutional rights on Town properties in non-private areas of the Town properties.

167.   Defendant Michael Jewitt, at all times relevant, in his capacity as Town of Quartzsite Council member, conspired with other Council members presently on the Town Council, as named in the caption above, to create and sustain unconstitutional policies and/or unconstitutionally vague policies with no legitimate government interest of the Town regarding the use of audio recording, video recording, and camera-type devices in public access areas of QTH, Town campuses, and facilities of the Town so as to have such policies inflicted upon Mr. Gilford by town administrative management and/or Town employees when Mr. Gilford attempts to assert his First Amendment Constitutional rights on Town properties in non-private areas of the Town properties.

168.   On August 2, 2011 Mr. Jewitt called Mr. Gilford to demand that a video recorded interview which Mr. Jewitt had permitted to be made by Mr. Gilford - be removed from

public display on the internet on Mr. Gilford's website blog and or YouTube. Mr. Gilford declined to respond to the request. Mr. Jewitt:

"*Yeah. I guess I will come knocking on your door. You know. It's that easy. OK.*"

169.   On August 9, 2011 Mr. Jewitt received a seat on the Town Council by appointment.

170.   Defendant Carol Kelley, at all times relevant, in her capacity as Town of Quartzsite Council member, conspired with other Council members presently on the Town Council, as named in the caption above, to create and sustain unconstitutional policies and/or unconstitutionally vague policies with no legitimate government interest of the Town regarding the use of audio recording, video recording, and camera-type devices in public access areas of QTH, Town campuses, and facilities of the Town so as to have such policies inflicted upon Mr. Gilford by Town administrative management and/or Town employees when Mr. Gilford attempts to assert his First Amendment Constitutional rights on Town properties in non-private areas of the Town properties.

171.   Defendant Jose Lizarraga, at all times relevant was elected in the capacity of a Town of Quartzsite Council member and/or Mayor.  On or about July 13-19 of 2011, Mr. Gilford filed four separate factual complaints with the Quartzsite Police Department. In one of the four, Plaintiff complained that Council member Jose Lizarraga committed disorderly conduct at a public council meeting on May 24, 2011.

172.   On August 19, 2011, on behalf of the Town, Town Prosecutor Martin Brannan charged Mr. Gilford in Criminal Case #2 of 3 (CR20110097) with filing a false report for filing the complaint regarding the May 24, 2011 events involving Mr. Lizarraga.

173.   In Spring of 2010 the regular, non-partisan Council elections were scheduled and various recall efforts were begun against some of the Council members; recall petitions and open demands to resign were being initiated and/or circulated and signed by a number of citizens who had been publicly associated with the "*Citizens Coalition*". When Mr. Gilford signed a recall petition in 2010 against then-seated Council member

Jerry Lukkasson, soon after (upon finding Mr. Gilford had signed a recall petition against Mr. Lukkasson) Mr. Lukkasson contacted Mr. Gilford to inform him that he would not be doing any further real estate business with Mr. Gilford (Mr. Gilford is a real estate professional).

174.    Defendant Mark Orgeron, at all times relevant, in his capacity as Town of Quartzsite Council member, conspired with other Council members presently on the Town Council, as named in the caption above, to create and sustain unconstitutional policies and/or unconstitutionally vague policies with no legitimate government interest of the Town regarding the use of audio recording, video recording, and camera-type devices in public access areas of QTH, Town campuses, and facilities of the Town so as to have such policies inflicted upon Mr. Gilford by Town administrative management and/or Town employees when Mr. Gilford attempts to assert his First Amendment Constitutional rights on Town properties in non-private areas of the Town properties.

## COUNT ONE
## MALICOUS PROSECUTION
### (State claim)
(Defendants Gilbert, Taft, Lizarraga, Frausto, Garcia, Rodriguez, Johnson, Winslow, and Brannan.)

175.    The allegations and paragraphs set forth above are fully incorporated herein by this reference.

176.    Defendants Gilbert, Frausto, Garcia, Rodriguez, Johnson, Winslow, Taft, Lizarraga and Brannan conspired together to bring and brought criminal prosecutions against Plaintiff that terminated in Plaintiff's favor.  Said Defendants acted as the complaining witnesses and or prosecutors, actuated by malice and without probable cause.

177.    Case #1 as set forth above, was instigated by Winslow who called on Frausto, who in turn wrote up a police report, alleging Mr. Gilford harassed Winslow. While Frausto only listed two events, Mr. Brannan charged Mr. Gilford with three counts of harassment.

178.   In Case 3 Mr. Johnson made a personal call to Sgt. X.Frausto, resulting in Frausto ordering his officer Rodriguez to arrest Mr. Gilford.

179.   All prosecutions against Mr. Gilford were terminated with the acquittal and or dismissal of Mr. Gilford. In case #1, Special Prosecutor Jones himself acted to dismiss all the charges after Mr. Gilford admitted to all the allegations but showed he had not committed a crime.  In cases #2 & #3, Judge Sherwood Johnston III found Mr. Gilford not guilty of all remaining charges at trial.

180.   The above described Defendants actions proximately caused Plaintiff injury and damage in an amount to be proven at trial.

181.   As a result of these arrests, Plaintiff suffered incarceration, injury to reputation, emotional distress and had to hire a criminal defense attorney to defend him in Criminal Cases #2 & #3 as set forth above.

182.   The Town of Quartzsite is respondeat superior liable for the acts of its Defendants who acted within the Course and Scope of their employment. In the alternative, Plaintiff is entitled to punitive damages against Defendants.

## COUNT TWO
## MALICOUS PROSECUTION
(42 U.S.C. § 1983)
(All Defendants)

183.   The allegations and paragraphs set forth above are fully incorporated herein by this reference.

184.   Defendants and each of them, acted under color of state law, and engaged in conduct that was the proximate cause of a violation of Plaintiff's rights under the First, Fourth, and/or Fourteenth Amendments to the Constitution of the United States of America, including but not limited to his right to be free from retaliatory arrest for asserting claims against public employees and the Town and from arrest, incarceration and/or criminal prosecution without evidence of probable cause, thereby violating Plaintiff's civil rights under 42 U.S.C. § 1983.

185.   Defendants, and each of them, under color of state law, conspired together to bring and brought criminal prosecutions against Plaintiff that terminated in Plaintiff's acquittal and or dismissal.  Said Defendants acted as the complaining witnesses and or prosecutors, actuated by malice and without probable cause.

186.   Case #1 was instigated by Winslow who called on Frausto, who in turn wrote up a police report, alleging Mr. Gilford harassed Winslow. While Frausto only listed two events, Mr. Brannan charged Mr. Gilford with three counts of harassment.

187.   In Case #3, Johnson contacted Frausto. Soon Frausto ordered his officer Rodriguez to arrest Mr. Gilford.

188.   All prosecutions against Mr. Gilford were terminated in the acquittal and or dismissal of Mr. Gilford. In #1, Special Prosecutor Jones himself moved to dismiss all charges after Mr. Gilford admitted to all the allegations but showed he had not committed a crime.

189.   At trial in cases #2 & #3, Judge Sherwood Johnston III dismissed two charges (moved by the attorneys) and ruled not guilty.

190.   The malicious prosecution of Plaintiff directly resulted from Town of Quartzsite policies, practices, procedures, customs and/or was ratified by the Town of Quartzsite's directors, also known as the Common Council; and that such a policies, practices, procedures, customs and/or ratifications, or the Town of Quartzsite's directors' failure to properly train and supervise its employees, was the proximate cause of violations of Plaintiff's rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States of America.

191.   Defendants' actions proximately caused Plaintiff injury and damage in an amount to be proven at trial.  As a result of these arrests, Plaintiff suffered incarceration, injury to reputation, emotional distress and had to hire a criminal defense attorney to defend him for Case #2 and Case #3, financial damage of posting bond and consequential damages suffered by Mrs. Gilford in driving at night on dark highway, stuck in soft shoulder after

attempting to respond to jailer's call suggesting she return to the jail to post the bond. The jailer initially disallowed bond payment in error on Mrs. Gilford's earlier visit.

192.   Plaintiff is entitled to bring this cause of action against the Defendants pursuant to 42 U.S.C. § 1983.

193.   Plaintiff is entitled to recover his attorneys' fees incurred in this matter pursuant to 42 U.S.C. § 1988(b).

194.   Plaintiff is entitled to punitive damages.

**COUNT THREE**
**FALSE ARREST – FALSE IMPRISONMENT**
**SELECTIVE PROSECUTION**
(42 U.S.C. § 1983)
(All Defendants)

195.   The allegations and paragraphs set forth above are fully incorporated herein by this reference.

196.   In committing the above referenced actions and/or omissions, Defendants, and each of them, conspired together and acted under color of state law, and engaged in conduct that was the proximate cause of a violation of Plaintiff's rights under the First, Fourth, and/or Fourteenth Amendments to the Constitution of the United States of America, including but not limited to, his right to be free from selective prosecution, retaliatory arrest for asserting claims against a public employee and arrest, incarceration and/or criminal prosecution without probable cause, thereby violating Plaintiff's civil rights under 42 U.S.C. § 1983.

197.   Defendants conspired to make false allegations to arrest Plaintiff and to commence and prosecute criminal charges against Plaintiff and that Defendants filed and pursued the criminal charges knowing the falsity of the allegations made.

198.   Defendants retaliated against Plaintiff because of his criticism of Town employees and his making lawful complaints to law enforcement to Town regarding misconduct.

199.   Defendants selectively prosecuted Plaintiff to prevent his exercise of his First Amendment rights.

200.   When Plaintiff complained to Quartzsite police officer Felipe Rodriguez that Mr. Johnson had taken the video camera out of Plaintiff's hands without his permission (felony theft in Arizona), Rodriguez would not take a report from Mr. Gilford and instead took him to jail.

201.   The Defendant Town of Quartzsite, the Quartzsite Prosecutor's office and the Quartzsite Police Department intentionally maintain and or engender policies, practices, procedures, customs (and or have ratified such conduct) that are deliberately indifferent to properly training its law enforcement officers regarding law and or precedent related to illegal search and seizure, selective prosecution, retaliatory confrontations, probable cause, false arrest, imprisonment, wrongful prosecution, conspiracy and harassment and that lack of such a policy, practice, procedure or custom to train officers was the proximate cause of a violation of Plaintiff's rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States of America.

202.   As a result of the Defendants' actions alleged above, and in violation of Plaintiff's rights under Federal and State law, Plaintiff suffered damages in an amount to be determined at trial.

203.   As a result of these arrests, Plaintiff suffered incarceration, injury to reputation, emotional distress and had to hire a criminal defense attorney to defend him for Case #3.

204.   Plaintiff is entitled to bring this cause of action against the Defendants pursuant to 42 U.S.C. § 1983.

205.   Plaintiff is entitled to recover his attorneys' fees incurred in this matter pursuant to 42 U.S.C. § 1988(b).

206.   Plaintiff is entitled to punitive damages.

**COUNT FOUR**
**42 U.S.C. § 1983**
**PLAINTIFF'S FIRST AMENDMENT AND ARTICLE II, SECTIONS 6**
**OF THE ARIZONA GUARANTEED RIGHTS TO FREE SPEECH,**
**FREEDOM OF THE PRESS, RIGHT TO ASSOCIATE, RIGHT TO**
**ASSEMBLE AND RIGHT TO SEEK REDRESS OF GRIEVANCES**
**(All defendants)**

207.   The allegations and paragraphs set forth above are fully incorporated herein by this reference.

208.   At all times relevant to this Complaint as set forth in Plaintiff's factual allegations, Plaintiff was exercising his First Amendment rights under State and Federal Constitutional law. Plaintiff also filed several police reports against town officials/employees, exercising his free speech and redress of grievances.

209.   As a proximate result of exercising his First Amendment right, defendants retaliated by falsely accusing Plaintiff of criminal activity and having Plaintiff arrested and prosecuted without probable cause.

210.   In committing the above referenced actions and/or omissions, Defendants  and each of them, conspired together  and acted under color of state law, and engaged in conduct that was the proximate cause of a violation of Plaintiff's rights under the First Amendment to the Constitution of the United States of America, including but not limited to, his freedom of speech right, his right to contact his Town officials, his right to seek redress for grievances, his right to express his opinions or concerns and his  right to be free from retaliatory arrest and/or prosecution without probable cause for or while exercising his First Amendment rights and/or asserting claims against public employees, thereby violating Plaintiff's civil rights under 42 U.S.C. § 1983.

211.   Defendant Town of Quartzsite and the Quartzsite Police Department maintain policies, practices, procedures, customs (or have ratified such conduct) that are deliberately indifferent to and/or have failed to properly train its law enforcement officers regarding illegal search and seizure, retaliatory confrontations, probable cause, false

arrest, imprisonment, wrongful prosecution, conspiracy and harassment and that such a policy, practice, procedure or custom and/or training was the proximate cause of a violation of Plaintiff's rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States of America.

212.   As a result of the Defendant's actions alleged above, and in violation of Plaintiff's rights under Federal and State law, Plaintiff suffered damages in an amount to be determined at trial.

213.   As a result of these arrests, Plaintiff suffered incarceration, injury to reputation, emotional distress and had to hire a criminal defense attorney to defend him for Case #3.

214.   Plaintiff is entitled to bring this cause of action against the Defendants pursuant to 42 U.S.C. § 1983.

215.   Plaintiff is entitled to recover his attorneys' fees incurred in this matter pursuant to 42 U.S.C. § 1988(b).

216.   Plaintiff is entitled to punitive damages.

**COUNT FIVE**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(State Claim)**
(Defendants Chief Gilbert, Taft, Lizarraga, Frausto, Garcia,
Rodriguez, Johnson, Winslow, and Brannan.)

217.   The allegations and paragraphs set forth above are fully incorporated herein by this reference.

218.   All Defendants' acts and conduct as set forth above is extreme and outrageous, including but not limited to using their position of power over Plaintiff to have him falsely arrested and prosecuted because he was critical of those managing the Town of Quartzsite.

219.   Defendants' actions were intentionally done or at a minimum recklessly done to injure Plaintiff and to chill his exercise of his First Amendment and Equal Protection constitutional rights.

220.   Defendants' actions caused severe emotional distress to Plaintiff.

221.   Defendants acted jointly and in concert and conspired and agreed together to cause Plaintiff severe emotional distress by having him arrested and prosecuted without probable cause because of his criticism of Defendants and the false and malicious statements made by Defendants about Plaintiff, as set forth herein, that were at a minimum defamatory and designed to hold Plaintiff to a false light by the public.

222.   Plaintiff served a Proof of Claim on Defendants Chief Gilbert, Taft, Lizarraga, Frausto, Garcia, Rodriguez, Johnson, Winslow, and Brannan and therefore, pursuant to A.R.S.§ 821.01 can pursue these Defendants for this claim.

223.   The Town of Quartzsite is respondeat superior liable for that acts of the Individual Defendants.

224.   Plaintiff has suffered damages in an amount to be proven at trial.

225.   As a result of Defendants actions, Plaintiff suffered incarceration, injury to reputation, emotional distress and had to hire a criminal defense attorney to defend him for Case #3.

226.   Plaintiff is entitled to punitive damages.

## COUNT SIX
## CIVIL CONSPIRACY
### (All Defendants)

227.   The allegations and paragraphs set forth above are fully incorporated herein by this reference.

228.   Defendants conspired together and agreed to work together to commit the above tortuous and unconstitutional acts, including but not limited to bringing false allegations of criminal conduct against Plaintiff and to arrest him and prosecute him without probable cause.  The purpose was to intimidate and stop Plaintiff from investigating and criticizing and or complaining about the Defendants.

229.   Defendants and each and every one of them agreed and/or combined to engage in a

civil conspiracy to commit the unlawful, unconstitutional and tortuous acts described in this complaint.

230.   Defendants, and each and every one of them, combined to engage in a civil conspiracy against and/or injury to Plaintiff as described in this Complaint.

231.   Defendants, and each and every one of them, combined to engage in a civil conspiracy that was furthered by overt acts.

232.   Defendants, each and every one of them, understood, accepted, and/or explicitly and/or implicitly agreed to the general objectives of their scheme to inflict the wrongs against and/or injury to Plaintiff as described in this Complaint.

233.   Defendants, each and every one of them, combined to engage in a scheme that was intended to violate the rights of Plaintiff.

234.   The acts set forth in this Complaint, constitute pattern of activity to provide false information to the Court to obtain criminal prosecution and/or conviction of Plaintiff knowing they had no probable cause to do so.

235.   As a result of Defendants acts, Plaintiff was arrested, charged and criminally prosecuted without probable cause, all of which ended in Plaintiff's favor.

236.   Further, Plaintiff has been seriously emotionally impacted the acts of Defendants done in furtherance of their conspiracy.

237.   Plaintiff was forced to hire a criminal defense attorney.

238.   Defendants caused Plaintiff injury and damages in an amount to be proven at trial.

239.   As a result of Defendants actions, Plaintiff suffered incarceration, injury to reputation, emotional distress and had to hire a criminal defense attorney to defend him for Case #3.

240.   Plaintiff is entitled to punitive damages unless precluded by State law.

## COUNT SEVEN
## NEGLIGENT HIRING, RETENTION OR SUPERVISION

241.   Plaintiff incorporates herein by this reference all the preceding numbered

paragraphs as though fully set forth herein.

242.   The Town of Quartzsite was negligent in the supervision of the tortuous and unconstitutional actions of the individual Defendants as set forth in this complaint, which were all executive officers and/or either employees of the Town of Quartzsite

243.   The Town of Quartzsite was negligent in permitting or failing to prevent the tortuous and unconstitutional acts set forth in this Complaint by the individual Defendants.

244.   The Town of Quartzsite has caused damage to Plaintiff in an amount to be proven at trial.

245.   As a result of Defendants actions, Plaintiff suffered incarceration, defamation, injury to reputation, emotional distress and had to hire a criminal defense attorney to defend him for Case #2 and #3.

246.   The Town of Quartzsite was negligent in the supervision of the tortuous and unconstitutional activities of its employees as set forth in this complaint, who acted under contract with the Town of Quartzsite and who was negligent in permitting or failing to prevent the tortuous and unconstitutional acts set forth in this Complaint by the Individual Defendant employees.

247.   Plaintiff is entitled to punitive damages against the Employers.

**COUNT EIGHT**
**INJUNCTIVE RELIEF**

248.   The allegations and paragraphs set forth above are fully incorporated herein by this reference.

249.   As a result of the conduct of Defendants described above, Plaintiff has been denied his constitution and civil rights and in violation of Arizona Statute, wrongfully prohibited from videotaping open meetings and tape recording conversations he is a party to.  These

restrictions are intentionally made vague so that Plaintiff will not know what he can and cannot do so Defendants can press additional wrongful criminal charges against him.

250.   Plaintiff has no plain, adequate or complete remedy at law to address the wrongs described herein and remains exposes to criminal prosecution for videotaping or tape-recording conversations he legally has the right to do.

251.   Plaintiff therefore seeks injunctive relief restraining Defendants from continuing to engage in.

**ALL COUNTS**
**PUNITIVE DAMAGE STATEMENT**
(All Defendants)

252.   The allegations set forth above are fully incorporated herein by this reference.

253.   The acts of the Defendants toward Plaintiff amount to conduct that shocks the conscience, especially since most of the defendants swore an oath to uphold the most basic principles of our legal system and Constitution. The actions of the defendants were entered into with an evil mind and therefore, punitive damages are appropriate for all counts.

WHEREFORE, Plaintiff Douglas C. Gilford demands the following relief, jointly and severally, against Defendants as follows:

A.   Compensatory general and special damages in an amount according to proof at time of trial;

B.   Punitive damages;

C.   Reasonable attorneys' fees and expenses of litigation;

D.   Costs of suit necessarily incurred herein;

E.   Prejudgment interest according to proof; and

F.   A preliminary and permanent injunction prohibiting Defendants from stopping Plaintiff from attending open meetings, video (recording) taping open meetings from the

audience and (audio) tape recording conversations he is a party to with public employees providing service to the public and open counters in public buildings.

     G.    Such further relief as the Court deems just and proper.

     RESPECTFULLY SUBMITTED this 18th day of June, 2013.

                         KEITH M. KNOWLTON, L.L.C.

                    /s/ Keith Knowlton

By: _____

                    Keith M. Knowlton
                    Attorney for Plaintiff